336 P.3d 763

Maria Stella DUEÑAS, Special Administrator of the Estate of Maria Aspeitia, on behalf of the Estate of Maria Aspeitia, and Maria Stella Dueñas, Special Administrator, for and on behalf of Maria Aspeitia's statutory beneficiaries pursuant to A.R.S. § 12–612(A), Plaintiff/Appellant,

v.

LIFE CARE CENTERS OF AMERICA, INC., a Tennessee corporation; Glendale C.C., L.L.C., an Arizona limited liability corporation, dba Glendale Care Center; Cheryl Wartenberg, Administrator, Defendants/Appellees.

No. 1 CA–CV 13–0477.

Court of Appeals of Arizona, Division 1.

Oct. 21, 2014.

Wilkes & McHugh, P.A., By Melaine L. Bossie, Frederick A. Rispoli, Phoenix, Co–Counsel for Plaintiff/Appellant.

Law Office of Scott E. Boehm, P.C., By Scott E. Boehm, Phoenix, Co–Counsel for Plaintiff/Appellant.

Fann & Petruccelli, P.A., By J. Bowen Brown, Phoenix, Counsel for Defendants/Appellees.

Judge PETER B. SWANN delivered the opinion of the Court, in which Presiding Judge JOHN C. GEMMILL joined and Chief Judge DIANE M. JOHNSEN specially concurred.

## OPINION

SWANN, Judge.

¶ 1 A respite-care resident and a nursing facility entered into arbitration agreements. The resident's statutory beneficiaries and estate brought claims for wrongful death and violations of the Adult Protective Services Act ("APSA"), and the superior court dismissed those claims as subject to arbitration. We affirm the court's conclusion that the arbitration agreements were generally enforceable between the parties. We hold, however, that (1) the beneficiaries' wrongful-death claims are not subject to the resident's arbitration agreements, and (2) the APSA claim is not subject to arbitration to the extent that it arose from care provided during admissions for which the resident did not specifically agree to arbitration.

¶ 2 This case presents two questions of first impression. The first question is whether a decedent's arbitration agreement may require her statutory heirs to arbitrate their wrongful-death claims. We hold that a decedent's agreement to arbitrate cannot limit her heirs' right to litigate their own personal claims in the superior court. The second question is whether, when parties engage in serial transactions, each with its own proposed arbitration agreement, the court may examine the content of the arbitration agreements to determine whether the parties must arbitrate disputes concerning a specific transaction. We answer this question in the affirmative, and hold that A.R.S. § 12–3006(B) grants a party the right to a judicial determination of the existence of a relevant arbitration agreement.

## FACTS AND PROCEDURAL HISTORY

¶ 3 On four occasions in 2011, Maria Aspeitia was admitted to Glendale C.C., L.L.C. ("Glendale Care Center"), a nursing facility, as a respite-care resident. Following Aspeitia's death in early 2012, her daughter Maria Stella Dueñas, as special administrator of Aspeitia's estate and on behalf of her statutory beneficiaries, brought an action in superior court against Glendale Care Center, Life Care Centers of America, Inc., and Cheryl Wartenberg (collectively, "Defendants"), seeking damages for wrongful death and for abuse, neglect, and exploitation under the APSA.

¶ 4 Defendants moved to dismiss the complaint on the grounds that Dueñas' claims were subject to two arbitration agreements that she, as Aspeitia's representative, had signed—one near the end of Aspeitia's first admission to Glendale Care Center and one a few days after Aspeitia's second admission. Dueñas argued that the arbitration agreements were unenforceable on several grounds, including unconscionability and the doctrine of reasonable expectations. She further argued that the agreements did not apply to the wrongful-death claim because Aspeitia's statutory beneficiaries were not parties to the agreements. Finally, she argued that the agreements did not apply to the care that Aspeitia received during her last two admissions to Glendale Care Center because Dueñas did not sign the copies of the agreement that the care center offered her during or after those periods. Dueñas asked the court to deny Defendants' motion to dismiss or, alternatively, to allow discovery and hold an evidentiary hearing. She also filed a separate motion to commence discovery.

¶ 5 After oral argument, the court granted Defendants' motion to dismiss, concluding that the arbitration agreements were enforceable and that they applied to all claims set forth in the complaint. The court entered an appealable order of dismissal with prejudice, and Dueñas timely appeals. We have jurisdiction under A.R.S. § 12–2101(A).

## DISCUSSION

I. THE SUPERIOR COURT PROPERLY CONCLUDED THAT THE ARBITRATION AGREEMENTS WERE ENFORCEABLE.

¶ 6 Under A.R.S. § 12–3006(A), an agreement to arbitrate existing or subse-

quent controversies is "valid, enforceable and irrevocable except on a ground that exists at law or in equity for the revocation of a contract." An arbitration agreement therefore is subject to the same defenses to enforceability as any other contract. *Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 165 Ariz. 25, 28, 795 P.2d 1308, 1311 (App.1990). Here, Dueñas contends that the superior court should have found the arbitration agreements unenforceable because (1) they were procedurally unconscionable, (2) they were substantively unconscionable, (3) the terms went beyond the consumer's reasonable expectations, and (4) the consumer's assent was procured by way of a breach of fiduciary duties. She alternatively contends that she was entitled to discovery and an evidentiary hearing on these defenses. We hold that the superior court did not err by concluding that Dueñas' proposed defenses failed on the undisputed facts.[1]

¶ 7 As an initial matter, we reject Defendants' contention that Dueñas was required to prove both procedural and substantive unconscionability to avoid the agreements. Either doctrine can provide an independent defense to enforceability. *See Maxwell v. Fidelity Fin. Servs., Inc.*, 184 Ariz. 82, 90, 907 P.2d 51, 59 (1995).

A. Procedural Unconscionability

¶ 8 "Procedural unconscionability addresses the fairness of the bargaining process, which 'is concerned with "unfair surprise," fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should.'" *Clark v. Renaissance West, L.L.C.*, 232 Ariz. 510, 512, ¶ 8, 307 P.3d 77, 79 (App. 2013) (citation omitted).

> Under the procedural rubric come those factors bearing upon ... the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to

the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.

*Maxwell*, 184 Ariz. at 89, 907 P.2d at 58 (citation omitted). Other factors include whether the contract was separate from other paperwork, whether the contract used conspicuous typeface, *Clark*, 232 Ariz. at 512 n. 2, ¶ 8, 307 P.3d at 79 n. 2, and whether the contract was signed hurriedly and without explanation in emergency circumstances, *see Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken*, 179 Ariz. 289, 293, 877 P.2d 1345, 1349 (App.1994).

¶ 9 To determine whether an arbitration agreement is procedurally unconscionable, the court must examine each transaction on its own facts. Routine transactions involving insignificant risk are less prone to concerns over procedural unconscionability than substantial transactions. Though the factors listed above are helpful in the analysis, they are not exclusive, and the fundamental question is whether one party to a contract has unfairly or surreptitiously deprived the other of the right of access to the courts.

¶ 10 Dueñas provided some evidence in support of procedural unconscionability with her response to the motion to dismiss. In an undisputed declaration, she avowed that Glendale Care Center provided her with an arbitration agreement and other paperwork at the end of or after each of Aspeitia's admissions and that contrary to the agreements' recitals, she did not "receiv[e] a meaningful explanation from any Glendale Care Center employee about th[e] arbitration agreements." Dueñas further avowed that she would not have signed the arbitration agreements for the first two admissions had she been "fully informed concerning what arbitration is, the difference between arbitration and a jury trial, and what rights [Aspeitia] and her beneficiaries had under Arizona law as a vulnerable adult," and she "recall[ed] signing the paperwork so that [Aspeitia] could receive or continue to receive

---

**1.** "The validity and enforceability of a contract and arbitration clause are mixed questions of fact and law, subject to de novo review." *Estate*

*of DeCamacho v. La Solana Care & Rehab, Inc.*, 234 Ariz. 18, 20, ¶ 9, 316 P.3d 607, 609 (App. 2014).

care." Even viewing this evidence in the light most favorable to Dueñas, we agree with the superior court that the doctrine of procedural unconscionability does not render the agreements unenforceable in this case.

¶ 11 Dueñas had an opportunity to review each agreement and exercise independent judgment when deciding whether to sign it. There is no indication that the arbitration agreements were inconspicuously bundled with other contractual terms, or that Glendale Care Center placed her in the position of signing them as a precondition to care. And while Dueñas may now view arbitration in an unfavorable light, we cannot say that it was unconscionable that Glendale Care Center did not go out of its way to give her that perspective.

¶ 12 Dueñas next contends that the agreements were misleading. The agreements included the following written explanation:

> Arbitration is a method of resolving disputes without the substantial time and expense of using the judicial system. An arbitration hearing takes only weeks or months to schedule, while civil litigation generally takes years to complete. By avoiding the judicial system, many costs are eliminated. There are charges and fees involved in arbitration, but an arbitration hearing will almost always resolve a dispute sooner and at less cost than a trial.

Dueñas complains that this explanation misrepresents the relative merits of arbitration and traditional litigation, but she failed to present sufficient evidence that it is objectively false, or that she relied on any false statements. In support of her response to the motion, Dueñas provided copies of invoices showing costs incurred in several other cases in which her counsel had represented clients in arbitration, and she contended that in her counsel's experience arbitrating APSA claims "costs could easily reach $60,000." She did not, however, present any evidence regarding the speed of arbitration as compared to litigation in court, or of any potential savings that either form of litigation might offer over the other. It would be exceedingly difficult, if not impossible, to prove the general economic superiority of arbitration or traditional litigation, and this record contains no such attempt.

¶ 13 Dueñas also asserts that she believed she had to sign the agreements to secure her mother's care. If true, such a fact would be highly relevant to a procedural unconscionability argument. But Dueñas' assertion is directly contradicted by her sworn avowal that the agreements were provided to her *near the end of or after* each of her mother's first two admissions. The agreements also plainly state that they are "voluntary," "optional," and "not a precondition to receiving medical treatment at or for admission to the Facility," and Dueñas presented no evidence that she was told otherwise. Further, Dueñas had ample opportunity to ask questions before signing the agreements, and she did not present any evidence that she signed them under emergency conditions or that she was unable to understand them based on her age, intelligence, or experience. On this record, the superior court correctly concluded that the undisputed facts did not show procedural unconscionability.

### B.  Substantive Unconscionability

¶ 14 Substantive unconscionability addresses "the actual terms of the contract and ... the relative fairness of the obligations assumed." *Maxwell,* 184 Ariz. at 89, 907 P.2d at 58. Relevant factors include whether the contract terms are so one-sided as to oppress or unfairly surprise an innocent party, whether there is an overall imbalance in the obligations and rights imposed, and whether there is a significant cost-price disparity. *Id.* "An arbitration agreement may be substantively unconscionable if the fees and costs to arbitrate are so excessive as to 'deny a potential litigant the opportunity to vindicate his or her rights.'" *Clark,* 232 Ariz. at 512, ¶ 9, 307 P.3d at 79 (citation omitted). To show this type of unconscionability, the party challenging the arbitration agreement must present specific, non-speculative evidence regarding several factors. *Id.* at 513, ¶ 10, 307 P.3d at 80; *Harrington v. Pulte Home Corp.,* 211 Ariz. 241, 253, ¶¶ 47–49, 119 P.3d 1044, 1056 (App.2005). First, the party must present reasonably certain evidence regarding the probable costs of arbitration; second, she must present individual-

ized evidence regarding her inability to pay those costs. *Clark*, 232 Ariz. at 513, ¶¶ 10–11, 307 P.3d at 80. The court also must consider whether the arbitration agreement or relevant arbitration rules allow for waiver or reduction of costs based on financial hardship. *Id.* at ¶ 12.

¶ 15 In *Clark*, we affirmed the superior court's determination that an arbitration agreement was substantively unconscionable based on excessive fees and costs. *Id.* at 515, ¶ 21, 307 P.3d at 82. The plaintiff in *Clark* presented expert testimony regarding the likely hourly rate of arbitrators, the number and types of witnesses his case would require, and the estimated duration of arbitration proceedings. *Id.* at 513, ¶ 14, 307 P.3d at 80. The plaintiff also presented evidence that he was retired, lived on a fixed income based in part on need-based veteran's assistance, and had no savings or stocks. *Id.* at 514, ¶ 18, 307 P.3d at 81. Dueñas presented no similar proof. Dueñas provided no evidence of the costs she could expect to incur based on her claims, and she provided no evidence regarding the financial circumstances of either the estate or the statutory beneficiaries.

¶ 16 On appeal, Dueñas contends that the superior court's failure to grant her request for discovery and a hearing denied her the opportunity to obtain the necessary evidence. But evidence of the likely costs of presenting the claims at arbitration and evidence of the real-parties-in-interests' financial resources was within Dueñas' control. Dueñas did not require discovery from Defendants to meet her burden to show substantive unconscionability, and we perceive no error in the superior court's determination that Dueñas made no threshold showing sufficient to require an evidentiary hearing.

C. Reasonable Expectations

¶ 17 A party who signs a standardized agreement generally adopts the terms set forth therein, but "[w]here the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 391, 682 P.2d 388, 396 (1984) (quoting Restatement (Second) of Contracts § 211 (1981)). "This reason to believe may be (1) shown 'by the prior negotiations,' (2) 'inferred from the circumstances,' (3) 'inferred from the fact that the term is bizarre or oppressive,' (4) proved because the term 'eviscerates the non-standard terms explicitly agreed to,' . . . (5) proved if the term 'eliminates the dominant purpose of the transaction' " (6) shown if the term would not be understandable to a consumer who attempted to check on his rights, or (7) shown by any other relevant facts. *Harrington*, 211 Ariz. at 247–48, ¶ 19, 119 P.3d at 1050–51 (quoting *Darner*, 140 Ariz. at 392, 682 P.2d at 397).

¶ 18 In *Broemmer v. Abortion Services of Phoenix, Ltd.*, 173 Ariz. 148, 152, 840 P.2d 1013, 1017 (1992), our supreme court applied "reasonable expectations" to hold that an arbitration agreement was unenforceable. The plaintiff in *Broemmer* was an unmarried, inexperienced, high-school-educated, emotionally distressed young woman who sought counseling at an abortion clinic. *Id.* at 149, 152, 840 P.2d at 1014, 1017. Without providing any explanation, the clinic asked the plaintiff to sign an arbitration agreement. *Id.* at 150, 151, 840 P.2d at 1015, 1016. She did so even though years later she "[wa]s still not sure 'what arbitration is.' " *Id.* at 152, 840 P.2d at 1017.

¶ 19 We reject Dueñas' contention that her circumstances were akin to those in *Broemmer*. Unlike the plaintiff in *Broemmer*, Dueñas presented no evidence that she was inexperienced, distressed, or otherwise vulnerable. Nor did she present evidence that she signed the agreements in circumstances akin to duress.

¶ 20 These agreements were not contracts of adhesion.[2] A contract of adhesion offers goods or services "on essentially a 'take it or leave it' basis without affording the

---

2. Arbitration clauses contained in contracts of adhesion are not *per se* unenforceable, though a contract of adhesion may raise heightened concerns under the doctrine of reasonable expectations. *See Broemmer*, 173 Ariz. at 151, 840 P.2d at 1016.

consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract." *Id.* at 150, 840 P.2d at 1015 (citation omitted). The arbitration agreements that Dueñas signed provided that acquiescence was *not* required for Aspeitia to receive care, and care was actually provided *before* the agreements were signed. Contrary to Dueñas' contention, the language used in the arbitration agreements did not compel a finding that any of the terms was incomprehensible. The superior court did not err by concluding that based on the undisputed facts the agreement was within the consumer's reasonable expectations.

### D. Breach of Fiduciary Duties

¶ 21 Dueñas finally contends that the arbitration agreements were unenforceable because Glendale Care Center breached fiduciary duties to obtain her signature. While we recognize that care facilities owe their patients heightened duties in connection with the care they provide, Dueñas has cited no authority that would subject Glendale Care Center to a fiduciary duty in connection with the purely commercial aspects of their relationship. Absent such a duty, the unconscionability and reasonable expectations analysis controls.

¶ 22 We affirm the superior court's conclusion that the arbitration agreements were generally enforceable. We next consider whether the superior court erred by concluding that the agreements precluded the entirety of the complaint.

### II. THE ARBITRATION AGREEMENTS DO NOT APPLY TO THE STATUTORY BENEFICIARIES' WRONGFUL–DEATH CLAIM.

¶ 23 The superior court concluded that the arbitration agreements applied to the wrongful-death claim asserted by Aspeitia's statutory beneficiaries, even though the beneficiaries did not sign the agreements. The question of whether a non-party is bound by an arbitration agreement is properly resolved by the court as a matter of law. *Smith v. Pinnamaneni*, 227 Ariz. 170, 177–

78, ¶¶ 23–25, 254 P.3d 409, 416–17 (App. 2011).

¶ 24 The arbitration agreements that Dueñas signed on Aspeitia's behalf provide that they "shall inure to the benefit and bind ... the Resident, his/her successors, assigns, agents, insurers, heirs, trustees, and representatives, including the personal representative or executor of his or her estate; and his/her successors, assigns, agents, insurers, heirs, trustees, and representatives." "Heirs" include wrongful-death beneficiaries who are, as here, the decedent's children. *See* A.R.S. § 12–612(A) (wrongful-death beneficiaries include decedent's children); A.R.S. § 14–1201(25) (defining "heir" in probate code as "persons ... who are entitled under the statutes of intestate succession to the property of a decedent"); A.R.S. § 14–2102 (including "surviving issue" in intestate succession scheme); A.R.S. § 14–1201(29) & (12) (defining "issue" as "all of the decedent's descendants of all generations, with the relationship of parent and child at each generation"). The superior court concluded that because the arbitration agreements purported to bind "heirs," Aspeitia's children—who were not parties to the agreements—were required to arbitrate their wrongful-death claim.

¶ 25 A wrongful-death claim is "an original and distinct claim for the damages sustained by named statutory beneficiaries[; i]t is not derived from nor is it a continuation of claims which formerly existed in a decedent." *Huebner v. Deuchle*, 109 Ariz. 549, 549–50, 514 P.2d 470, 470–71 (1973). The damages that may be recovered are the beneficiaries', not the decedent's. *Estate of DeCamacho v. La Solana Care & Rehab, Inc.*, 234 Ariz. 18, 24, ¶ 24, 316 P.3d 607, 613 (App.2014). For this reason, *DeCamacho* held that an arbitration agreement covering "any actions brought on behalf of the Resident by third parties" did not include wrongful-death claims asserted by the resident's statutory beneficiaries. *Id.* at 22–23, 24, 25, ¶¶ 16, 24, 27, 316 P.3d at 611–12, 613–14. *DeCamacho* left open, however, the question that we must now decide—"whether express language in the agreement purporting to bind the statutory heirs to arbitrate

their wrongful death claims [is] valid and enforceable." *Id.* at 25 n. 5, ¶ 27, 316 P.3d at 614 n. 5. We hold that such terms are not enforceable.

¶ 26 "In general, a party is bound to arbitrate only those disputes which it has contractually agreed to arbitrate," *Smith*, 227 Ariz., at 176, ¶ 22, 254 P.3d at 415, and is not bound to arbitrate disputes it has not specifically agreed to arbitrate, *Able Distrib. Co. v. James Lampe, General Contractor*, 160 Ariz. 399, 410, 773 P.2d 504, 515 (App. 1989). There are some exceptions to the general rule. *Schoneberger v. Oelze*, 208 Ariz. 591, 594 & n. 5, ¶¶ 11, 14, 96 P.3d 1078, 1081 (App.2004), *superseded by* A.R.S. § 14–10205. Theories for binding a non-signatory to an arbitration agreement include incorporation by reference, assumption, agency, veil-piercing or alter ego, equitable estoppel, and third-party beneficiary. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347 (5th Cir.2003). On this record, however, no circumstances appear to suggest that any exception to the general rule applies. The agreements were not made part of any separate agreement by Aspeitia's children, were not signed on the children's behalf, were not assumed by the children, and were not structured for their benefit.

¶ 27 While Dueñas, as Aspeitia's agent, was free to take actions during Aspeitia's lifetime that would later bind her estate, she could not contractually limit the children's personal claims without their assent. Under *Huebner*, the statutory beneficiaries' wrongful-death claims belonged to them, and never belonged to Aspeitia. To be sure, a beneficiary may not maintain a wrongful-death claim unless the decedent would have been able to maintain a claim had she lived. *Hutton v. Davis*, 26 Ariz.App. 215, 216, 547 P.2d 486, 487 (1976). This means that a settlement by the decedent may bar a claim by a beneficiary based on the same underlying conduct. *See id.* (holding that decedent's execution of covenant not to sue precluded beneficiaries' wrongful-death action); *Schoenrock v. Cigna Health Plan of Ariz., Inc.*, 148 Ariz. 548, 550, 715 P.2d 1236, 1238 (App. 1985) (holding that decedent's settlement of medical malpractice claim precluded beneficiaries' wrongful-death action). It also means that a beneficiary's claim will be subject to the same defenses to liability as the decedent's claim. *See Gibson v. Boyle*, 139 Ariz. 512, 515, 679 P.2d 535, 538 (App.1983) (holding that contributory negligence defense applies to wrongful-death claim). But these principles concern the substantive viability of a wrongful-death claim on the merits—they do not address the question of whether the forum for such a claim may be restricted by the decedent.

¶ 28 The underlying rationale of cases such as *Hutton* and *Schoenrock* is clear. When a defendant pays to absolve itself of liability for its conduct, it should receive the benefit of its bargain. And when affirmative defenses (such as contributory negligence or accord and satisfaction) exist, those defenses are no less valid simply because the plaintiff is a statutory beneficiary rather than the decedent. An agreement to arbitrate, however, is not an affirmative defense. *See* Ariz. R. Civ. P. 8(c).[3]

¶ 29 An agreement to arbitrate relates to the jurisdiction of the courts, not to the merits, viability or ownership of a claim. Absent an actual agreement by the beneficiaries to arbitrate, or a legislative enactment expanding the binding effect of arbitration agreements to third parties, we conclude that the beneficiaries are entitled to maintain their wrongful-death action in court.[4] The superior court's conclusion to the contrary was error.

3. Rule 8(c) identifies "arbitration *and award*" as an affirmative defense. We have no difficulty with the proposition that private arbitration that results in an award should be given the full preclusive effect provided by law. But this case does not involve a concluded arbitration—it concerns only the forum in which the claims must be litigated in the future.

4. Defendants point out that in *Ruiz v. Podolsky*, 50 Cal.4th 838, 114 Cal.Rptr.3d 263, 237 P.3d 584 (2010), the California Supreme Court reached a different result. *Ruiz*, however, was based on a California statute governing arbitration of medical malpractice claims. See *id.*, 114 Cal.Rptr.3d 263, 237 P.3d at 591–95.

### III. ASPEITIA DID NOT AGREE TO ARBITRATE APSA CLAIMS RELATED TO HER LAST TWO ADMISSIONS TO GLENDALE CARE CENTER.

¶ 30 Unlike wrongful-death claims, APSA claims are derivative claims that may be raised by the personal representative of a decedent's estate. *In re Estate of Winn*, 225 Ariz. 275, 278, 237 P.3d 628, 631 (App.2010). The APSA claim in this action is therefore subject to arbitration to the extent Aspeitia agreed to arbitrate it. The ultimate question here is whether Dueñas bound the estate to arbitrate *all* disputes when she signed the first two agreements, or whether her agreement to arbitrate only applies to claims arising from the first two admissions. But the first question is whether this determination should be made by the court or by an arbitrator.

¶ 31 Dueñas signed the arbitration agreements on Aspeitia's behalf in 2011. The agreements are therefore governed by the Arizona Revised Uniform Arbitration Act, A.R.S. §§ 12–3001 *et seq. See* A.R.S. § 12–3003(A)(1). Under the Act, the general rule is that "[t]he court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." A.R.S. § 12–3006(B). In other words, both the existence and scope of arbitration agreements are ordinarily decided by the court, and not by an arbitrator.

¶ 32 The parties may, however, waive or vary the effect of this provision. A.R.S. § 12–3004. By using clear language, the parties may assign the obligation to determine an arbitration agreement's existence or scope to the arbitrator. *See, e.g., Saguaro Highlands Cmty. Ass'n v. Biltis*, 224 Ariz.

294, 295–96, ¶ 5, 229 P.3d 1036, 1037–38 (App. 2010) (holding that arbitration clauses are to be construed liberally in favor of arbitration, but "'an arbitrator cannot resolve issues which go beyond the scope of the submission agreement' and '[p]arties are only bound to arbitrate those issues which by clear language they have agreed to arbitrate'" (citations omitted)).[5]

¶ 33 The arbitration agreements that Dueñas signed provided that "any dispute arising out of the diagnosis, treatment, or care of the resident, *including the scope of this arbitration clause* ... or the arbitrability of any claim or dispute ... shall be resolved by binding arbitration." (Emphasis added.) This language expressly delegated to the arbitrator the duty to determine the scope of the parties' agreements to arbitrate. It did not, however, delegate the duty to determine whether an agreement existed.

¶ 34 Defendants argue that the question here is merely one of scope (and therefore subject to arbitration) because the identical agreements include several broad statements that they apply to "any dispute" between Aspeitia and Glendale Care Center.[6] But the controlling provision in the agreements actually states that they apply to "all disputes ... arising out of or in any way related or connected to the Resident's stay and care provided at the Facility." This provision refines and qualifies the broader statements, limiting the agreements to disputes regarding the "stay and care provided." *See ELM Retirement Ctr., LP v. Callaway*, 226 Ariz. 287, 291, ¶ 18, 246 P.3d 938, 942 (App.2010) ("[B]ecause specific contract provisions express the parties' intent more precisely than general provisions, specific provisions qualify the meaning of general provisions.").

---

5. In some circumstances, questions regarding an arbitration agreement's existence and its scope may overlap. *Cf. City of Cottonwood v. James L. Fann Contracting, Inc.*, 179 Ariz. 185, 189–93, 877 P.2d 284, 288–92 (App.1994) (timeliness of demand to arbitrate is to be considered by court to extent it is a factor in a repudiation defense, but is to be considered by arbitrator to extent it is a procedural precondition).

6. Our concurring colleague likewise concludes that the delegation of questions of scope to the arbitrator in the first two agreements should

require an arbitrator to decide whether *any* disputes fall within the scope of those agreements. We recognize that the question could effectively be resolved either by a judicial inquiry into the existence of a later agreement or an arbitrator's evaluation of the scope of an earlier agreement. But the question of existence is primary, and the approach taken by the concurrence would, in our view, accord insufficient significance to a party's decision not to sign a proposed arbitration agreement.

¶ 35 Defendants contend that because the agreements reference the "stay *and care* provided," they are not limited to care provided during a particular stay and "govern[ ] all care provided" at any time. This interpretation contradicts the agreements' plain language. We must read the agreements in a manner that gives meaning to both "stay" and "care." *Miller v. Hehlen*, 209 Ariz. 462, 466, ¶ 11, 104 P.3d 193, 197 (App.2005) ("[W]e must interpret a contract in a way that gives meaning to all its material terms and renders none superfluous."). "Stay" describes a temporal concept, whereas "care" describes a type of attention or services. *See* Webster's Third New International Dictionary, Unabridged, s.v. "stay" and "care," accessed June 6, 2014, http://unabridged.merriam-webster.com (defining "stay," as relevant, as "a temporary residence or sojourn: a period of abode" and defining "care," as relevant, as "responsibility for or attention to safety and well-being"); *see also In re Estate of Wyatt*, 232 Ariz. 506, 509, ¶ 8, 307 P.3d 73, 76 (App. 2013) (" 'Care' is generally defined as 'charge, supervision, management: responsibility for or attention to safety and wellbeing.' " (citation omitted)), *vacated*, 235 Ariz. 138, 329 P.3d 1040 (2014). Under the arbitration agreements, "care" therefore describes the substantive qualities of conduct that can give rise to arbitrable disputes and "stay" describes a temporal limitation on such conduct. In other words, the agreements define arbitrable disputes as those that arise from the care provided *during* the stay. We also note that though the agreements provide that they shall apply to "services rendered prior to the date of this agreement," the agreements make no mention of subsequent services.

¶ 36 Defendants point to a provision stating that "[a]ll claims based in whole or in part on the same incident, transaction, or related course of care or services provided by the Facility to the Resident, shall be arbitrated in one proceeding." This provision merely sets forth a procedure for the arbitration of arbitrable claims, and prohibits serial arbitrations. It does not prescribe which claims are arbitrable.

¶ 37 In the proceedings below, Defendants advanced an expansive definition of "stay," arguing that "Aspeitia had many residency periods, but her stay at the facility began when she was admitted and ended when she left the facility for the last time." On appeal, however, Defendants do not challenge Dueñas' argument that "stay" refers to each discrete admission-to-release period, and they assert without further explanation that "[n]one of the terms used are ambiguous [and s]tay is a clear term." The parties' apparent agreement regarding the meaning of "stay" is consistent with the word's common definition as "a temporary residence or sojourn: a period of abode." Webster's Third New International Dictionary, Unabridged, s.v. "stay," accessed June 6, 2014, http://unabridged.merriam-webster.com.

¶ 38 Construing "stay" as referring to each distinct period of residency is also consistent with the parties' undisputed course of dealing. Defendants did not present Dueñas with a single agreement that purported to subject all future disputes to arbitration. Instead, they presented a form agreement for each admission, and Dueñas declined to sign the agreement for the last two admissions. If, as Defendants contend, a single agreement encompassed all of Aspeitia's admissions, then they would not have provided her with agreements to sign in connection with each admission. The only way that the *scope* of the first two agreements could be interpreted to cover Aspeitia's third and fourth admissions would be if the word "stay" in the agreements were read to mean "all stays," or if the commonly understood meaning of "stay" were cast aside altogether. Such an interpretation would not only be highly questionable linguistically—it would also render the second agreement (which Dueñas did sign) superfluous.

¶ 39 Because we evaluate contracting parties' intent in a manner that gives effect to each word in their agreements (and to the agreements themselves), we must conclude that no arbitration agreements exist with respect to the third and fourth stays. Defendants chose to structure the relationship as a series of separate transactions rather than as a continuing liaison, thereby giving Dueñas

the ability to decide which admissions would be subject to arbitration. Her exercise of that decision-making power must have meaning. We must conclude that the APSA claim is cognizable in court to the extent it arose from Aspeitia's last two admissions. The superior court's submission of the entirety of the APSA claim to arbitration was error.

## CONCLUSION

¶ 40 The arbitration agreements that Dueñas signed on Aspeitia's behalf constituted enforceable contracts, but they apply neither to the wrongful-death claim asserted by Aspeitia's statutory beneficiaries nor to claimed APSA violations arising from Aspeitia's last two admissions to Glendale Care Center. We therefore reverse and remand the superior court's dismissal of the wrongful-death claim and its dismissal of the entirety of the APSA claim. We affirm the dismissal of the APSA claim to the extent it arose from care provided during the first two stays, but we vacate the portion of the dismissal order that purports to enter dismissal "with prejudice." A dismissal of claims subject to arbitration should be entered without prejudice, to allow for further judicial determinations that may prove necessary.

JOHNSEN, C.J., specially concurring:

¶ 41 I concur with the majority's opinion in every respect except for its conclusion that whether certain claims are subject to arbitration is a question concerning the existence of an arbitration agreement, and therefore is a matter to be decided by the court rather than by an arbitrator. In my view, the question is not whether there exists an arbitration agreement that covers claims arising from the last two admissions. Instead, the question is whether claims arising from the last two admissions are arbitrable under the terms of the two agreements that Dueñas executed. Put differently, the question is whether those claims fall within the scope of the agreements Dueñas executed in connection with the first two admissions. As the majority acknowledges, ¶ 33, the parties to the arbitration agreements agreed that questions of arbitrability would be reserved to the arbitrator. *See Brake Masters Systems, Inc.*

*v. Gabbay,* 206 Ariz. 360, 78 P.3d 1081 (App. 2003) (enforcing parties' agreement that arbitrator would determine whether claims were arbitrable). Under the agreements the parties executed, therefore, the scope of those agreements—whether they covered a particular claim—was for the arbitrator to decide, not for the court. Neither party, however, has questioned the authority of the superior court or this court to decide arbitrability. Because both have waived the right to have the arbitrator decide the question, we may do so. I fully concur in the majority's analysis of the arbitrability of claims arising from Aspeitia's final two admissions, and agree with the majority that those claims do not fall within the scope of the arbitration agreements Dueñas executed in connection with the first two admissions.