NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

GWYNN ANTONSON and BRETT ANTONSON, wife and husband,
*Plaintiffs/Appellees*,

*v.*

RED MOUNTAIN MED SPA, LLC, an Arizona limited liability company,
*Defendant/Appellant*.

No. 1 CA-CV 14-0389
FILED 6-11-2015

Appeal from the Superior Court in Maricopa County
No.  CV2012-006056
The Honorable Lisa Daniel Flores, Judge

**AFFIRMED**

COUNSEL

Rose Law Group, PC, Scottsdale
By Christopher Ingle and Logan V. Elia
*Counsel for Plaintiffs/Appellees*

Sherman & Howard, LLC., Scottsdale
By Michael W. Wright, Arthur W. Pederson, and Gabriel A. Peraza
*Counsel for Defendant/Appellant*

---

## MEMORANDUM DECISION

Judge Donn Kessler delivered the decision of the Court, in which Acting Presiding Judge Samuel A. Thumma and Chief Judge Diane M. Johnsen joined.

---

**K E S S L E R**, Judge:

¶1 Red Mountain Med Spa, LLC ("Red Mountain") appeals from the superior court's summary judgment and award of attorneys' fees in favor of Gwynn and Brett Antonson ("the Antonsons"). For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Red Mountain is a medical spa and general family medical practice with seven locations in Arizona. Red Mountain's physician-assisted services are provided through Suzanne Bentz Jewell, D.O. ("Dr. Bentz"), the Medical Director and part owner of Red Mountain, and two additional physicians.

¶3 Gwynn Antonson ("Dr. Antonson") completed medical school in 2008 and was finishing the last year of her residency in New Jersey in 2011. Dr. Antonson contacted Red Mountain regarding potential employment. After Dr. Antonson interviewed with Red Mountain, the parties exchanged a series of emails. On March 16, 2011, Mark Bentz, Red Mountain's Chief Executive Officer (the "CEO"), emailed Dr. Antonson with an employment proposal:

> It was nice seeing you and getting to know you a little better. We appreciate your interest in Red Mountain, and look forward to the possibility of working together. [Dr. Bentz] and I have thought further about how to integrate you into the practice, and I think we can simplify the process a bit.
>
> Here's what we would propose.
>
> **Training**—*We would offer you an initial 90 day trial period*, where you would work with [Dr. Benz] and a number of other providers in our practice to acquire the skills necessary to perform effectively as a Physician in our practice. We will pay

you *at a rate of $50 per hour* (or $104,000 annualized) during this training period.

**Transitional period**—*After the initial 90 days, if you're comfortable in the position, and we feel your progress is satisfactory, we would raise your hourly rate to $60 or $125,000 annualized.* You would work for an additional 90 day transitional period in order to get more comfortable with our customer service style, processes, and procedures.

**Six month review**—Upon completing your first six months, we will conduct a review, and present you with a more formalized offer for joining Red Mountain Med Spa as a full time Medical Provider.

Let me know if this plan sounds good to you, and we can coordinate your start date, and training itinerary.

(Emphases added.) Dr. Antonson responded, stating, "I have had time to look over your email and I think that your plan looks great." In subsequent emails, Red Mountain agreed to contribute towards Dr. Antonson's moving expenses, Arizona licensing application fee, and health insurance premiums. The parties ultimately agreed that Dr. Antonson would begin working at Red Mountain on August 15, 2011.

¶4        On June 28, 2011, Red Mountain's CEO sent an email to Dr. Antonson informing her that there had been "developments" at the company related to internal staffing issues. As a result, because it would be a challenge to get her enough hours in one of the medical spas, Red Mountain asked Dr. Antonson if she "would be willing to do a day or two at the Family Practice as well." Dr. Antonson responded, noting that although she was not excited about working in the family medicine office, she was willing to fulfill those hours:

As you know, I never wanted to practice family medicine and I wasn't planning on doing so at all after finishing my residency, I feel very strongly about this. When I read your email I have to admit I wasn't excited to hear your proposition about taking hours at the family practice and I felt like I was put into a difficult situation. I already feel like my husband and I are going out on a limb by moving out to Arizona without anything in writing, just an agreement via email, but I feel very comfortable with you and Dr. Bentz, and I felt like it would be a great fit at Red Mountain Med Spa. . . . I know I

am the new employee coming in, and we are still feeling each other out, I do understand that. I am a reasonable person and I really do want to be able to help you and Dr. Bentz fill your needs. I am willing to take hours at the family practice office. That being said, I also don't want to be seen as a pushover and I think there are a lot of issues I'd like to clarify and discuss before fully agreeing to anything.

The email also included a list of questions regarding the amount of work and time she would be expected to spend in the family medicine office. Red Mountain replied that, based on Dr. Antonson's comments, Red Mountain would not be hiring her:

We had hoped that since you've just completed your residency in Family Medicine, we *may* be able to utilize your skills in that area until we can fully integrate you into the Med Spa, as patient demand permits. . . . Your strong feelings against practicing Family Medicine raises serious questions about whether this would be a suitable way to utilize your skills in the interim, since your heart is clearly not in accepting this assignment.

Your suggestion that we allow you to see derma patients only on a specific day is not acceptable to us. It further raises the question of what kind of team player you would be if you joined us. Would you be someone who pitches in where needed, or someone who has to make up their own rules? . . .

My experience has been that when there are difficulties and misunderstandings such as these "going in to a business relationship," it rarely gets better.

Since we have no need for an additional Physician in our Med Spa, and you're not interested in working in the Family Practice, there is really no opportunity at Red Mountain for you at this time. I'm sorry for the misunderstanding, and the timing of this news, but based on your response this is the only reasonable business decision we can make.

¶5　　　　The Antonsons filed suit against Red Mountain alleging anticipatory breach of contract and breach of the implied covenant of good faith and fair dealing. The Antonsons certified that the matter was required to go to court-ordered arbitration and the arbitrator awarded them $39,990 for both claims. Red Mountain appealed that award. Presented with cross-

motions for summary judgment, the trial court granted summary judgment for the Antonsons on their claim of anticipatory breach of contract and for Red Mountain on the claim of breach of the implied covenant of good faith and fair dealing. As to the anticipatory breach of contract, the court reasoned that the emails agreeing on a 90-day trial period:

> meet[] the statutory requirements for a contract for specific duration of employment, as contemplated by [Arizona Revised Statutes section] 23-1501. The contract was in writing, and the e-mailed offer was "signed" by Red Mountain's CEO . . . when he placed his name at the end of the offer. Bentz testified that the e–mail was an offer, that [Dr. Antonson] accepted it by e-mail and the parties had an employment agreement.

The court concluded that the "inclusion of the word 'trial' to describe the 90-day period does not change the fact that the employment term is for a specific duration. Refusing to allow [Dr. Antonson] to start work is classic anticipatory breach." It awarded the Antonsons $29,990 in compensatory damages (based on 90-days employment, the moving costs, and Dr. Antonson obtaining a medical license). After denying Red Mountain's motion for reconsideration and overruling its objection to the Antonsons' application for attorneys' fees, the superior court entered a final judgment awarding the Antonsons the above damages, $49,033 in reasonable attorneys' fees, and $2,012.50 in taxable costs.

¶6        Red Mountain timely appealed We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(1) (Supp. 2014).[1]

## DISCUSSION

¶7        On appeal, Red Mountain argues the court should have granted its motion for summary judgment on the claim for anticipatory breach. Specifically, it argues: (1) the exchange of emails did not create a contract because specific terms were lacking; (2) if there was a contract of employment it was not for a specific duration to allow a breach of contract action under the Employment Protection Act, A.R.S. § 23-1501 (Supp. 2014) (the "EPA"); and (3) the exchange of emails was not signed for purposes of the EPA. It also argues the superior court erred in awarding attorneys' fees

---

[1] We cite the current version of applicable statutes if no revisions material to this decision have since occurred.

because the Antonsons did not provide the court with the actual billing statements to show what was billed and paid by the Antonsons and approximately $10,000 of the fees were expended in the court-ordered, but assertedly unnecessary, arbitration.[2]

¶8        "We review a trial court's grant of summary judgment de novo, viewing the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Hourani v. Benson Hosp.*, 211 Ariz. 427, 432, ¶ 13, 122 P.3d 6, 11 (App. 2005). "We review issues of statutory interpretation de novo, attempting to fulfill the legislature's intent in enacting the statute." *State v. Barnett*, 209 Ariz. 352, 354, ¶ 7, 101 P.3d 646, 648 (App. 2004). "If the language of a statute is clear and unambiguous, we must give it effect without resorting to any rules of statutory construction." *Id*. (quoting *State v. Johnson*, 171 Ariz. 39, 41, 827 P.2d 1134, 1136 (App. 1992)). "An award of attorney fees is left to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." *Orfaly v. Tucson Symphony Soc'y*, 209 Ariz. 260, 265, ¶ 18, 99 P.3d 1030, 1035 (App. 2004). "A court abuses its discretion if it commits an error of law in reaching a discretionary conclusion, it reaches a conclusion without considering the evidence, it commits some other substantial error of law, or 'the record fails to provide substantial evidence to support the trial court's finding.'" *Flying Diamond Airpark, LLC v. Meienberg*, 215 Ariz. 44, 50, ¶ 27, 156 P.3d 1149, 1155 (App. 2007) (quoting *Grant v. Ariz. Pub. Serv. Co.*, 133 Ariz. 434, 456, 652 P.2d 507, 529 (1982)).

I.        The Parties Agreed to Sufficient Material Terms to Form an Enforceable Contract

¶9        Red Mountain argues that the parties did not agree upon all of the material terms for a contract, and as a result, a contract was never formed. Red Mountain argues the agreement lacked specificity of terms because Dr. Antonson identified issues regarding her involvement in the family practice that still needed to be discussed and the parties had not

---

[2] Red Mountain also conclusorily argues the complaint failed to state a cause of action upon which relief can be granted because the complaint did not specifically allege that the contract met the requirements of the EPA. Red Mountain cites no authority for the proposition that a claim for anticipatory breach of contract must include such specificity. *See Rowland v. Kellogg Brown and Root, Inc.*, 210 Ariz. 530, 533, ¶ 13, 115 P.3d 124, 127 (App. 2005) (explaining that Arizona is a notice pleading state). Accordingly, we will not further address this argument except in the context of the motions for summary judgment.

agreed on the exact days and hours Dr. Antonson would work during the initial 90-day trial period.

¶10          "It is elementary that for an enforceable contract to exist there must be an offer, an acceptance, consideration, and *sufficient specification of terms* so that the obligations involved can be ascertained." *Savoca Masonry Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975) (emphasis added); *see also K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 139 Ariz. 209, 212, 677 P.2d 1317, 1320 (App. 1993) ("An offer cannot be accepted so as to form a contract unless there is sufficient specification of terms so that the obligations involved can be ascertained."). However, "certainty of terms relates to the parties' intent to contract: '[T]he requirement of certainty is not so much a contractual validator as a factor relevant to determining the ultimate element of contract formation—the question whether the parties manifested assent or intent to be bound.' Thus, the overriding question is whether the parties intended to contract." *AROK Constr. Co. v. Indian Constr. Servs.*, 174 Ariz. 291, 295, 848 P.2d 870, 874 (App. 1993) (alteration in original) (quoting *Schade v. Diethrich*, 158 Ariz. 1, 9, 760 P.2d 1050, 1058 (1988)). "The old 'formalist' view limited the agreement to written terms and emphasized rules of contract, such as the requirement that the agreement include all material terms. This has long since given way to the 'realist' approach . . . . [The realist approach] emphasizes standards rather than rules, and assigns to courts the task of upholding the agreements parties intended to make." *Id*. The determination of intent is a factual question, and "must be based on

objective evidence, not the hidden intent of the parties." *Tabler v. Indus. Comm'n*, 202 Ariz. 518, 521, ¶¶ 12-13, 47 P.3d 1156, 1159 (App. 2002).[3]

¶11 Thus, in determining whether the terms are sufficient to make a binding contract, if the terms that are set forth are sufficient to show the intent, the court can supply any missing terms consistent with the intent of the parties. *See* Restatement (Second) of Contracts § 33 cmt. a ("But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon."); *see also Schade*, 158 Ariz. at 8-11, 760 P.2d at 1057-60 (finding sufficient manifested mutual assent to be bound despite the absence of basic terms); *AROK Constr. Co.*, 174 Ariz. at 297, 848 P.2d at 876 ("If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left. . . . The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere wish, will, and desire exists, either by virtue of the agreement itself or by commercial practice or other usage or custom." (internal quotation marks and citation omitted)).

¶12 Here, Red Mountain's CEO testified in his deposition that the parties had agreed to the terms of Dr. Antonson's employment:

---

[3] Restatement (Second) of Contracts § 33 cmt. a (1981) provides:

> It is sometimes said that the agreement must be capable of being given an exact meaning and that all the performances to be rendered must be certain. Such statements may be appropriate in determining whether a manifestation of intention is intended to be understood as an offer. But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain. . . . Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract.

Q. Okay. What I get from [the March 16, 2011 email] is that Red Mountain was talking with [Dr.] Antonson about her possibly joining Red Mountain as an employee, correct?

A. Correct.

Q. All right. And then later on it says, "Here is what we propose."

. . . .

Q. Okay. To me, this appears to be an offer. This is kind of the terms and conditions that we're thinking about you joining Red Mountain. Is it your testimony that this is not an offer?

A. No, it's an offer.

. . . .

Q. . . . [In Dr. Antonson's response] [i]t says, "I've had time to look over your e-mail and I think that your plans looks great." . . . Do you think that's her accepting the offer?

A. Yes.

. . . .

Q. Do you think that somebody reading [your email response to Dr. Antonson] would understand, "We look forward to working with you," as it being a done deal?

. . . .

[A.] Yeah, I can understand that.

. . . .

Q. Okay. Does this indicate to you that [Dr. Antonson] was planning on starting working for Red Mountain in August?

A. Yes.

9

Q. And it's your position that you didn't have an agreement with -- that Red Mountain didn't have an employment agreement with [Dr.] Antonson, right?

A. Yes.

Q. So why didn't you set her straight when she says, "I'm going to be starting in August"? Why didn't you say, whoa, we don't have a deal yet?

A. We have an agreement, not an employment agreement. You mean like a contract?

Q. Well, you said we have an agreement but not an employment agreement. What kind of agreement did you have?

A. *We had an agreement to terms for her to come work for us. I don't dispute that.*

Q. Okay. So Red Mountain said you come -- how about you come work for us. [Dr. Antonson] said, sure, that sounds good. When do I start? You guys say let's start in August. You don't dispute any of this?

A. No. It's all here in the e-mail.

Q. In your mind that doesn't form an agreement for her to come work at Red Mountain?

A. *At this point in time, she had an agreement to come work at Red Mountain.*

(Emphases added.)

¶13 Not only did Red Mountain's CEO admit that the parties had an agreement for Dr. Antonson to begin working for Red Mountain in August 2011, but according to Red Mountain, the only term left to be negotiated at the time of the formation of the initial contract was Dr. Antonson's specific work schedule. "The standard for contract enforceability is not whether the agreement included a resolution of every matter and anticipated every contingency." *AROK Constr. Co.*, 174 Ariz. at 297, 848 P.2d at 876. Instead, "[t]he terms of a contact are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33(2).

If the trial court can determine whether there was a breach by Red Mountain and create an appropriate remedy for Dr. Antonson, then the terms of the contract are reasonably certain and enforceable. "Thus, 'gaps' or omitted terms, or vague or indefinite terms, are not invariably fatal to the rights of the parties to obtain enforcement of their bargain." *AROK Constr. Co.*, 174 Ariz. at 298, 848 P.2d at 877. "Only '[i]f the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken' does a contract not exist." *Id.* (alteration in original) (quoting Restatement (Second) of Contracts § 33 cmt. a). Because the later decision by Red Mountain not to allow Dr. Antonson to start work was a purported total breach of the contract, the absence of terms pertaining to her specific work schedule is not fatal to her claim. *See id*.

¶14 Therefore, the trial court did not err in concluding that Red Mountain failed to offer evidence sufficient to create a genuine issue of material fact in support of its contention that the parties failed to enter into a contract.

II. The Contract Established a Specified Duration of Employment under A.R.S. § 23-1501(A)(2).

¶15 Red Mountain argues that the exchange of emails did not constitute a contract of employment for a "specified duration of time" under A.R.S. § 23-1501(A)(2) and thus created, at most, an at-will employment agreement, precluding an action for breach of contract. The emails established an agreed-upon 90-day "trial" period. Red Mountain argues that the use of the term "trial" period in its offer of employment meant there was no specified period of duration under the EPA because the term "trial" is equivalent to "at-will." Red Mountain also argues that to avoid being at-will, a contract must include language from the statute that "the contract shall remain in effect" for the specific period of time. Antonson argues that the term "trial" in the contract is meaningless under the terms of the statute because the exchanged emails made it clear that Dr. Antonson was to be employed for 90 days.

¶16 Generally, when parties disagree about the terms of a contract or there is ambiguity about the material terms of the contract, summary judgment would be inappropriate. If that were true here, what the parties meant by a "trial period for 90 days" would have to be determined by a factfinder after a trial. However, both parties take the position on appeal that the only issue as to the meaning of the 90-day trial period is whether the contract, as construed by its four corners, is at-will under A.R.S. § 23-1501(A)(2). Thus, the parties have limited the issue to one of statutory

construction; if the language of the contract meets the requirements of A.R.S. § 23-1501(A)(2), the Antonsons were entitled to summary judgment, and if not, Red Mountain was entitled to summary judgment.

**¶17**        The EPA establishes that except under certain statutory provisions not applicable here, an employment relationship is at-will and severable by either party unless the parties "have signed a written contract to the contrary setting forth that the employment relationship shall remain in effect for a specified duration of time." A.R.S. § 23-1501(A)(2). "An employee has a claim against an employer for termination of employment only if . . . (a) The employer has terminated the employment relationship of an employee in breach of an employment contract, as set forth in paragraph [(A)(2)], in which case the remedies for the breach are limited to the remedies for a breach of contract." A.R.S. § 23-1501(A)(3).

**¶18**        Taken as a whole, the contract here specified a duration under A.R.S. § 23-1501(A)(2). We apply the plain language of the statute to reflect the legislative intention. *See Barnett*, 209 Ariz. at 354, ¶ 7, 101 P.3d at 648. The EPA expressly states that an employee may bring an action for breach of contract only if the written contract provides "the employment relationship shall remain in effect for a specified duration of time." A.R.S. § 23-1501(A)(2). The statute thus establishes a black-letter rule requiring the contract to state "a specified duration of time." *Id*. The agreed-upon emails by the parties in this case established a 90-day period, which satisfies the requirement of the statute.

**¶19**        Red Mountain relies on various dictionary definitions, cases from other jurisdictions, and one case from Arizona which interpret a clause providing for a trial or probationary period as either being at will or

not entitling the employee to a hearing before being fired.[4] That reliance is misplaced for several reasons. First, none of those cases address the statutory language used in the EPA.

¶20 Second, even if we applied the reasoning of those cases to help us interpret A.R.S. § 23-1501, we have to construe the entire contract to ascertain its terms. *See Duenas v. Life Care Ctrs. of Am., Inc.*, 236 Ariz. 130, 141, ¶ 35, 336 P.3d 763, 774 (App. 2014) (applying the rule that in interpreting a contract, we must give meaning to all material terms and render none of them superfluous); *Tabler*, 202 Ariz. at 521, ¶ 13, 47 P.3d at 1159 ("The determination of the parties' intent must be based on objective evidence, not the hidden intent of the parties.").

¶21 Under certain circumstances, a 90-day "trial" period could mean that the contract is at-will. However, Red Mountain's argument ignores that the agreement characterizes the first 90-day period as a training period at $50 per hour and immediately thereafter provides, "*After the initial 90 days, if you're comfortable in the position, and we feel your progress is satisfactory, we would raise your hourly rate to $60 or $125,000 annualized.*" (Emphasis added.) *See supra* ¶ 3. This clause gives meaning to the term "trial period," and makes plain that after the "90-day trial period," the parties would decide whether to carry on their relationship. That, in turn, indicates the parties agreed to undertake this contractual relationship for a period of no less than 90 days.

---

[4] A "probationary employee" is "[a] recently hired employee whose ability and performance are being evaluated during a trial period of employment," Black's Law Dictionary 564 (8th ed. 2004), and "probationary" can be defined as "exploratory" or "serving to test," Bryan A. Garner, A Dictionary of Modern Legal Usage 694 (2d ed. 1995). *See Smith v. Pima County Law Enforcement Council*, 113 Ariz. 154, 157, 548 P.2d 1151, 1154 (1976) (equating a probationary term to a trial period precluding a right to a hearing under county law enforcement merit system rules); *Kosulandich v. Survival Tech., Inc.*, 997 F.2d 431, 432 (8th Cir. 1993) (noting that probationary employees "were clearly at-will employees"); *Moe v. E. Air Lines, Inc.*, 246 F.2d 215, 219 (5th Cir. 1957) ("In effect, the employment relationship during the probationary period is an employment at will, or so long as is mutually agreeable to both of the parties."); *Schwarz v. Adm'rs of Tulane Educ. Fund*, 699 So.2d 895, 898 (La. Ct. App. 1997) ("[I]mplicit in the status of non-tenured/probationary employee is the assumption that protection against arbitrary or repressive dismissal is absent, i.e., the doctrine of employment at will prevails.").

¶22        At oral argument, Red Mountain also contended that to be other than an at-will contract, the contract must contain the language of the statute, providing that "the employment relationship shall remain in effect for a specified duration of time" (or equivalent language) followed by the time period.  It is true that expressly including such language, or expressly negating such language, would remove any issue to be resolved by litigation.  That said, Red Mountain's argument fails.  The clear language of the statute is that if a contract states a specific duration, or a specific minimum duration, it is not at-will.  The legislature did not suggest that a contract would have to mimic the language of the statute, and accepting Red Mountain's argument would place form over substance.  If employers desire to provide a durational period but want to maintain that it is at-will, they can expressly state it is at-will in the written terms of the agreement.  Particularly given that an employer controls the terms of its offer, the fact that Red Mountain used the language it did here—using an express minimum duration of time for employment without stating that the employment was at-will employment—is telling.  Accordingly, the trial court did not err in concluding the contract established a specified duration of employment under A.R.S. § 23-1501(A)(2).

III.    The Offer Was Deemed Signed

¶23        Red Mountain also argues that the offer was not signed by both parties as required by the EPA because the parties had not agreed that their names at the ends of the email offer and acceptance would constitute their signatures.

¶24        We disagree.  First, Red Mountain misreads the EPA.  Section 23-1501(A)(2), while not a model of clarity, does not require both parties to sign the agreement.  Rather, a breach of contract action can be brought if all parties signed or if "this written contract . . . [is] signed by the party to be charged."  A.R.S. § 23-1501(A)(2).  Thus, if Red Mountain's CEO's name at the end of the email offer was sufficient to bind Red Mountain, and the other terms of the EPA are met, a breach of the contract is actionable.

¶25        Second, Red Mountain's CEO effectively admitted during his deposition that the offer and acceptance were binding.  As he testified, based on the offer and acceptance in the emails,  there was an agreement:

> Q.  Well, you said we have an agreement but not an employment agreement.  What kind of agreement did you have?

A. *We had an agreement to terms for her to come work for us. I don't dispute that.*

Q. Okay. So Red Mountain said you come -- how about you come work for us. [Dr. Antonson] said, sure, that sounds good. When do I start? You guys say let's start in August. You don't dispute any of this?

A. No. It's all here in the e-mail.

Q. In your mind that doesn't form an agreement for her to come work at Red Mountain?

A. *At this point in time, she had an agreement to come work at Red Mountain.*

(Emphases added.) *See supra* ¶ 12.

**¶26**          A party is bound by his sworn statements and testimony and cannot contradict that evidence to avoid summary judgment unless he can show he was confused when he testified or additional facts have come to light. *See Wright v. Hills*, 161 Ariz. 583, 587-88, 780 P.2d 416, 420-21 (App. 1989), *abrogated in part on other grounds by James, Cooke & Hobson, Inc. v. Lake Havasu Plumbing & Fire Prot.*, 177 Ariz. 316, 319, 868 P.2d 329, 332 (App. 1993). Red Mountain's CEO admitted the offer and acceptance in the emails amounted to an agreement. Red Mountain may not defeat summary judgment by attaching a declaration to its statement of facts in which its CEO contradicts his testimony and avers he never intended his signature to be effective.

IV.     The Court Did Not Abuse Its Discretion by Awarding Attorneys' Fees

**¶27**          Red Mountain argues that the superior court erred by awarding the Antonsons attorneys' fees because in filing their fee application, the Antonsons never submitted the actual billings and payments. It also contends the fee award was excessive because the fee request included time spent in the mandatory arbitration when the Antonsons sought an amount in excess of the ceiling for mandatory arbitration when they filed their summary judgment motion.

**¶28**          In filing their application, the Antonsons' attorney averred the terms of the agreement, provided detailed itemized billings by attorney, verified that the Antonsons were obligated to pay those amounts, and

offered to submit the billings if the court requested. Moreover, and particularly given such detail, Red Mountain cites no authority for the proposition that a party seeking a fee award has to submit the actual attorney bills for the court's review. The court did not abuse its discretion in relying on the verified statements and itemization of billings.

¶29 Red Mountain also argues that although the Antonsons certified compulsory arbitration was required, after prevailing at arbitration and after Red Mountain appealed, they asked for more than $115,000 in damages. Thus, according to Red Mountain, the fees sought for the arbitration were unnecessary because the damages exceeded the ceiling for mandatory arbitration.

¶30 Red Mountain's argument ignores that at arbitration, the Antonsons only requested under $50,000 in damages and were awarded $39,990 for both claims. The Antonsons explained to the trial court that to keep matters simple, they had kept their damage claims in the arbitration to less than $50,000. Red Mountain did not dispute that statement. Thus, the arbitration proceedings were not useless or unnecessary because if Red Mountain had not appealed, the matter would have been resolved. Red Mountain cannot complain that by its appealing the award for a trial de novo and the Antonsons then increasing their damage demand that the court abused its discretion in awarding the fees incurred in the arbitration.

## CONCLUSION

¶31 For the reasons stated above, we affirm the judgment in favor of the Antonsons. Both parties request an award of attorneys' fees and costs on appeal pursuant to A.R.S. § 12-341.01(A) (Supp. 2014). Red Mountain has not prevailed on appeal and is not entitled to an award of fees. In the exercise of our discretion, we award the Antonsons attorneys' fees and taxable costs on appeal upon their timely compliance with ARCAP 21.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama

16