IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

_____

BNCCORP, INC. and BNC NATIONAL BANK, *Plaintiffs/Appellants*,

*v.*

HUB INTERNATIONAL LIMITED, HUB INTERNATIONAL
INSURANCE SERVICES, INC., HUB INTERNATIONAL OF
CALIFORNIA INSURANCE SERVICES, INC., and HUB
INTERNATIONAL SOUTHWEST AGENCY LIMITED,
*Defendants/Appellees.*

No. 1 CA-CV 15-0708
FILED 7-11-2017

_____

Appeal from the Superior Court in Maricopa County
No. CV2012-014329
The Honorable Lori Horn Bustamante, Judge

**AFFIRMED**

_____

COUNSEL

Anthony Ostlund Baer & Louwagie PA, Minneapolis, MN
By Richard T. Ostlund, Shannon M. Awsumb
*Counsel for Plaintiff/Appellant BNCCORP, Inc.*

Ryley Carlock & Applewhite PA, Phoenix
By Fredric D. Bellamy
*Co-Counsel for Plaintiff/Appellant BNC National Bank*

Law Offices of Michele Van Quathem PLLC, Phoenix
By Michele Van Quathem
*Co-Counsel for Plaintiff/Appellant BNC National Bank*

Osborn Maledon PA, Phoenix
By David D. Garner
*Counsel for Defendants/Appellees*

---

**OPINION**

Judge Jon W. Thompson delivered the opinion of the Court, in which Presiding Judge Randall M. Howe and Judge Lawrence F. Winthrop joined.

---

**T H O M P S O N**, Judge:

**¶1**          BNCCORP, Inc. (BNCCORP) and BNC National Bank, N.A. (The Bank) (collectively, BNC), appeal from the trial court's judgments in favor of HUB International Limited, HUB International Services, Inc., HUB International of California Insurance Services, Inc., and HUB International Southwest Agency Limited (collectively, HUB).  For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

**¶2**          BNCCORP, a Delaware corporation, is a registered bank holding company with its principal place of business in Bismarck, North Dakota.  It does business through wholly owned subsidiaries, including The Bank.  The Bank's main office is in Arizona.  The Bank has branches in Arizona, North Dakota and Minnesota.  In 2002, BNC purchased BNC Insurance Services, Inc. (BIS), an insurance agency.[1]  BNC utilized BIS for all its insurance broker needs.

**¶3**          In 2004, BNC entered a mortgage-loans-in-transit (MLT) agreement with Concord Mortgage (Concord).[2]  Pursuant to that agreement, Concord originated loans using up to $100 million in funds provided by BNC, with BNC retaining a 100% participation interest in each loan.  Concord then sold the loans in the secondary market and paid BNC back the principal and accrued interest.

---

[1]      BNC Insurance Services, Inc. was known as Milne Scali & Company at the time.  It was one of the largest independent insurance agencies in Phoenix.

[2]      Concord is not a party to this action.

¶4            Although at the time BNC was placing all its own insurance coverage through BIS, the MLT agreement was a custom agreement that BNC's lawyers drafted.  BNC did not take additional steps to determine whether it had coverage for any fraud or other risks that may be associated with the new MLT arrangement.

¶5            In 2005, BNC's Chief Financial Officer (CFO) questioned whether the MLT relationship should be included in BNC's insurance application.  At the time, BIS had assigned its employee, Kathy Cook (Cook), as the insurance broker for BNC's insurance renewal.  Because of its CFO's question, BNC, through BIS and Cook, added an optional coverage known as "servicing contractor coverage" to its financial institution bond and excess follow-form bond insurance policies with Chubb Group of Insurance Companies (Chubb)[3] to insure the MLT relationship with Concord.  BNC did not seek a special endorsement or manuscript policy concerning any specific aspects of the Concord MLT relationship.

¶6            In October 2006, BNC entered into another MLT agreement with American Mortgage Specialists (AMS), an Arizona corporation.[4]  The AMS MLT agreement was the same basic contract as was used for the Concord MLT agreement.  Like Concord, AMS was to originate mortgage loans using funds from BNC, service the loans, and sell them in the secondary market, and repay to BNC, principal, interest and fees.  Under the agreement, BNC allowed AMS to draw up to $27.5 million in funds from BNC at any time.

¶7            In March 2006, the Arizona Department of Financial Institutions (ADFI), under a seventeen-page Consent Order, had sanctioned AMS and fined it nearly a quarter of a million dollars for unlawful conduct, unlicensed activity, failure to maintain proper records, failure to maintain control over bank accounts, failure to comply with an earlier 2004 Consent Order, and pages of additional enumerated violations. The record does not indicate that BNC investigated AMS's standing with ADFI.

¶8            BNC approved and decided to go forward with an MLT relationship with AMS while BNC was renewing its insurance policies in August 2006.  However, BNC did not disclose this new MLT agreement in

[3]      Chubb was BNC's insurance carrier at the time.

[4]      BNC began considering entering a relationship with AMS in fall 2005, but actively explored doing so as of April 18, 2006.

its renewal application and requested coverage "same as prior year." This included the same servicing contractor coverage that it had obtained in 2005 for the Concord MLT relationship. BNC did not seek, through BIS, a special endorsement, rider or other coverage specific to the MLT program (Concord and AMS)—such as one that would cover the risk of a lapping scheme fraud.

¶9 On March 14, 2007, the relationship between BNC and HUB began pursuant to a Purchase and Sale Agreement (PSA). BNCCORP and BIS were the named parties to the agreement, along with HUB International of California Insurance Services, Inc. (Hub Cal.). Pursuant to the PSA, BNC sold certain of BIS's assets and liabilities to HUB. HUB acquired BIS's book of business—including the BNC account. The BNC parties also agreed to appoint either Hub Cal. or one of the HUB "Affiliates"[5] as "the broker of record for all insurance maintained by [BNCCORP] and its direct and indirect wholly owned subsidiaries," which included The Bank.

¶10 The PSA did not require HUB to provide BNC with risk management services, to act as BNC's guarantor, or otherwise recommend services beyond those BNC sought. The PSA states that BNCCORP and "its Affiliates" retained liability for their pre-sale conduct, which would include conduct arising out of insurance broker services provided to BNC in 2005 and 2006, when BNC added servicing contractor coverage to its insurance package to cover its MLT relationships, including its relationship with AMS. The PSA also included a jury trial waiver.

---

[5] In defining affiliates, the PSA states:

> "Affiliate" means, with respect to *any specified Person*, *any other Person that*, at the time of determination, directly or indirectly through one or more intermediaries controls, *is controlled by or is under common control with such specified Person*. For purposes of this definition, the term "control" means the power to direct or cause the direction of the management of a Person, directly or indirectly, whether through the ownership of voting securities, contract or otherwise; and the terms "controlled" and "controlling" have meanings correlative to the foregoing.

(Emphasis added.)

¶11        In accord with the PSA, upon closing of the sale in mid-2007, BNC appointed HUB as its broker of record. Cook became HUB's employee and continued in her role as BNC's broker. She assisted BNC in obtaining its 2007 renewal with Chubb—providing coverage for a bond period from August 15, 2007, to August 15, 2008. The renewal policy Cook procured included a financial institution bond and excess follow-form policy that provided servicing contractor coverage that was materially identical to the coverage BNC previously obtained through BIS in 2005 and 2006. Again, BNC did not specifically seek coverage for risks associated with its MLT program.

¶12        Cook left her position at HUB in May 2008, and Timothy Elliot and Thomas Gilmor[6] reassigned the accounts Cook had serviced— including the BNC account. BNC's account was reassigned to HUB's insurance brokers, Jerry Thomas and Brett Plant, who completed the 2008 renewal.

¶13        Around the time of the 2008 renewal, BNC's policies with Chubb were about to expire. As to the 2008 renewal, in a June 30, 2008 letter BNC informed HUB, as follows:

> (1) We request a remarket this year. (2) We would like to look at the option of a three-year prepaid policy (or annual installments) as well as an annual renewal. (3) We would like the quote to include various deductible options. (4) We would like the quote to include a renewal at the current limits plus an increased limit for [Banker's Professional Liability (BPL)] and *any recommendations for other limit increases you feel appropriate*.

(Emphasis added.) As part of the 2008 renewal, BNC asked HUB to help it procure financial institution bond and excess follow-form policies from new insurance carriers that matched the coverages BNC's expiring insurance policies provided. BNC also requested servicing contractor coverage, but as in 2006, and 2007, BNC did not request any special

---

[6]    At the time, Elliot was managing a small unit focused on professional liability as its Assistant Vice President, in HUB's Denver office which was part of the Southwest region (included New Mexico, Arizona, and Colorado operations). Gilmor was the chief sales officer.

endorsement, rider or other coverage specific to AMS or BNC's MLT program.

¶14 Consistent with BNC's directions in the June 30, 2008 letter and specific requests, HUB obtained insurance quotes/options, from multiple insurers in the remarketing process—including quotes with annual renewals, some with three year renewals, with various deductibles, and requested increases. HUB met with BNC's management and board to present options from respective carriers.

¶15 Instead of staying with Chubb, which offered only a one-year term, BNC elected to move its primary coverage to Colonial/Zurich (Colonial) and its excess coverage to St. Paul Mercy Insurance Company/Travelers (Travelers) (collectively, the insurance carriers). The 2008 renewal policies provided BNC with materially identical coverage as it had with Chubb, but included a higher $14.9 million combined limit and a guaranteed three-year term. In its bond, Colonial "agree[d] to indemnify [BNC] for . . . [l]oss resulting from dishonest or fraudulent acts committed by any servicing contractor[7] acting alone or in collusion with others."

¶16 BNC did not identify any fraudulent activities in its relationship with AMS until April 2010, despite the activities of its own management, credit analysts, auditors, and regulators. Throughout its three-and-a-half-year relationship with AMS, BNC accepted and relied on AMS's representations concerning dates, amounts, and "sources" of secondary-market purchases of loans originated by AMS using funds provided by BNC. In April 2010, BNC discovered AMS had defrauded it out of a claimed $26 million (the AMS loss) in a "fraudulent lapping

---

[7] The Colonial bond's definition of "servicing contractor" includes any entity authorized by BNC to "(1) collect and record payments on real estate mortgage . . . loans made, held or assigned to the Insured, and establish tax and insurance escrow accounts, (2) manage real property . . . under the supervision or control of the Insured, [or] (3) perform any other acts related to the above." AMS's servicing responsibilities included the collection and recording of payments made on real estate mortgage loans and the performance of related acts, including, but not limited to, collecting and recording payments and establishing tax and insurance escrow accounts.

scheme." Prior to[8] discovery of the AMS loss, BNC had not asked or required any of the secondary-market investors who purchased loans from AMS to provide purchase (and/or payment) advices directly to BNC, nor did BNC require any other independent verification of AMS's representations that the investor funds were being applied to pay off the correct loans.

¶17 In July 2010, BNC submitted a proof of loss insurance claim and supporting information to Colonial and Travelers. Colonial denied the claim, and thereafter filed a lawsuit seeking declaratory judgment concerning its obligations under the bond. Travelers also filed a complaint for declaratory relief. Colonial's and Travelers's suits were consolidated (the coverage litigation). BNC filed counterclaims for breach of contract and bad faith, and sought punitive damages.

¶18 In September 2012, for $7.5 million, BNC settled its lawsuit against the insurance carriers. The settlement agreement reflects that BNC was contemplating filing a suit against HUB. BNC did so less than a week after settling with the insurance carriers, asserting a claim for negligence against HUB. The complaint demanded a jury trial.

¶19 In separate rulings in HUB's favor, the trial court found (1) pursuant to the waiver in the PSA, BNC had waived its right to a jury trial, and (2) HUB did not breach the applicable standard of care and that BNC did not prove HUB proximately caused BNC's damages. After denying BNC's motion for a new trial and/or to alter or amend judgment, the trial court entered final judgment, pursuant to Rule 54 on August 26, 2015.

¶20 BNC timely appealed to this court. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12-120.21 (2016) and -2101 (2016).[9]

---

[8] At some point after discovering the AMS fraud, BNC began requesting purchase (and/or payment) advices from the secondary-market investors that purchased loans originated by AMS, which could be used to match incoming payments with the intended assets.

[9] We cite a statute's current version, unless revisions material to this decision have occurred since the events in question.

**DISCUSSION**

**I.    Jury Waiver**

**¶21**       As a preliminary matter, we review whether the trial court erred in ruling that both BNCCORP and The Bank waived their right to a jury trial under the terms of the PSA.  Both The Bank and BNCCORP argue that the purported waiver does not extend to the negligence action.  Relying heavily on external authorities, The Bank separately argues that it is not bound by the jury trial waiver because it was neither a named party nor signatory to the PSA. We agree with the trial court's ruling as to both BNCCORP and The Bank.

**¶22**       Pursuant to the Arizona Constitution, a right to a jury trial "may be waived by the parties in any civil cause." Ariz. Const. art. 6, § 17. In Arizona, jury waivers are recognized as commonplace such that they typically "attract no attention." *Indus. Comm'n v. Frohmiller*, 60 Ariz. 464, 474, 140 P.2d 219, 223 (1943).  It has been said that the right to a jury trial in civil matters is "a privilege which may be waived by either party and not an absolute right." *Id*.   There are typically no procedural obstacles for obtaining a jury waiver in a civil case, and such waiver may be the consequence where parties simply fail to timely request a jury.  *See, e.g., Stukey v. Stephens*, 37 Ariz. 514, 516, 295 P. 973, 974 (1931).  It follows that parties may include such waiver provisions in their contractual agreements.

**¶23**       As pertinent here, the jury waiver in the PSA states[10]:

> Each party hereto hereby irrevocably and unconditionally waives any and all right to trial by jury in any action, suit, or proceeding *arising out of or related to this agreement* <u>or</u> *any of the transactions contemplated hereby*.  The parties acknowledge and agree that the terms and provisions of this section constitute a material inducement for the parties to enter into this agreement.

(Emphasis added.)  We interpret these terms to avoid surplusage. *See, e.g., Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 158 n.9, 854 P.2d 1134, 1144 n.9 (1993); *see also In re Estate of Zaritsky*, 198 Ariz. 599, 603, ¶ 11, 12 P.3d 1203, 1207 (App. 2000).

---

[10]       In contrast to the PSA's surrounding sections, the jury waiver is drafted in capitalized letters.

¶24        We find the negligence action falls within the terms of the PSA's jury waiver. This negligence action could not have arisen absent the relationships created by the PSA. The provision of broker services, which HUB is alleged to have negligently provided in procuring insurance for The Bank, arose out of and was a "transaction contemplated" by the PSA. The Bank acknowledges as much. In its briefing, The Bank states that the PSA required HUB to provide BNCCORP and its affiliates—which includes The Bank—with broker services for five years. Additionally, contrary to The Bank's and BNCCORP's position, the fact that HUB's duty and standard of care in the negligence action is dictated by Arizona law does not change the fact that the jury waiver is guided by the terms of the PSA which extends to the negligence action.

¶25        We further address The Bank's objection to being bound by the waiver because, as The Bank argues, it did not "knowingly and voluntarily" waive its right to a jury trial. In support of this position, The Bank asserts that the present jury waiver is unlike an agreement to arbitrate. Therefore, The Bank posits Arizona's policy not to presume against jury waivers—espoused in *Harrington v. Pulte Home Corp.*, which involves an arbitration agreement—is inapplicable in this matter. 211 Ariz. 241, 250, ¶ 30, 119 P.3d 1044, 1053 (App. 2005). We disagree. *See id.* (citations omitted) (stating, generally, that in civil actions "test of waiver applied to other constitutional rights, *i.e.*, that waiver be shown to be an intentional relinquishment or abandonment of a known right or privilege," is inapplicable).

¶26        Furthermore, we find the relevant jury trial waiver is analogous to an agreement to arbitrate.[11]  *See id.* at 249, ¶ 27, 119 P.3d at 1052 (citation omitted) ("Indeed, an agreement to submit disputes to arbitration is necessarily an agreement to forego dispute resolution by a jury."); *see also In re Guggenheim Corp. Funding, LLC*, 380 S.W.3d 879, 886 (Tex. App. 2012) (noting that public policy favoring freedom of contract requires that jury trial waivers be scrutinized in a manner similar to arbitration clauses).

¶27        Accordingly, we hold that in a civil action, waiver of a jury trial—like an agreement to arbitrate—need not always be directly "knowingly and voluntarily" waived. A non-signatory to a contract may

---

[11]        In some circumstances, the requirements for an agreement to arbitrate are much more stringent than simply choosing between a jury trial and a bench trial.

be bound by its parent company's contractual agreement to forego a jury trial, in accordance with the contract's jury trial waiver terms. *See, e.g.*, *Smith v. Pinnamaneni*, 227 Ariz. 170, 177, ¶ 23, 254 P.3d 409, 416 (App. 2011) (citations omitted) (noting that non-signatories, can be required to arbitrate, i.e, completely forego a judicial forum, under certain circumstances — such as estoppel, contract theories, and agency theories); *see Duenas v. Life Care Ctrs. of America, Inc.*, 236 Ariz. 130, 139, ¶ 26, 336 P.3d 763, 772 (App. 2014) (stating that theories that may bind a non-signatory to an agreement "include incorporation by reference, assumption, agency, veil-piercing or alter ego, equitable estoppel, and third-party beneficiary)[12] (citation omitted).

**¶28**        We conclude that as an affiliate obtaining broker services from HUB pursuant to the PSA, The Bank is bound, and could have reasonably expected that it would be bound, by the terms of the jury trial waiver in the PSA. We affirm the trial court's order granting HUB's Motion to Strike Jury Demand. In our analysis hereinafter, we address The Bank and BNCCORP as one entity, BNC.

## II.    The Negligence Action

**¶29**        The trial court rendered judgment regarding the negligence action after taking the matter under advisement. It issued an 18 page, single spaced decision after "carefully consider[ing] the testimony presented at trial, the hundreds of exhibits admitted into evidence, relevant case law, and the arguments of counsel." On appeal, we have an obligation "to affirm where any reasonable view of the facts and law might support the judgment of the trial court. This rule is followed even if the trial court has reached the right result for the wrong reason." *City of Phoenix v. Geyler*, 144 Ariz. 323, 330, 697 P.2d 1073, 1080 (1985) (citation omitted).

**¶30**        To establish negligence, BNC was required to prove: (1) HUB had a duty to conform to a certain standard of care; (2) HUB breached that standard of care; (3) a causal connection between HUB's conduct and BNC's

---

[12]        While *Duenas* lays out these theories, its facts distinctively warranted a different outcome. There, the court concluded that on the record before it, the subject non-signatories could not be bound by the subject arbitration agreements because the arbitration agreements were not made part of any separate agreement by the non-signatories, the agreements were not signed on the non-signatories' behalf, were not assumed by the non-signatories, and were not structured to benefit them. *See Duenas*, 236 Ariz. at 139, ¶ 26, 336 P.3d at 772.

resulting injury; and (4) BNC suffered actual damages. *See Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007) (citation omitted). Because we find BNC cannot establish breach of the applicable standard of care, we ultimately affirm the trial court's judgment in HUB's favor.

### A. Duty/Standard of Care

**¶31** "The initial question in a negligence action is whether the law imposes a duty on a defendant to conform to a certain standard of conduct to protect others from unreasonable risks of harm." *Sw. Auto Painting & Body Repair, Inc. v. Binsfield*, 183 Ariz. 444, 446, 904 P.2d 1268, 1270 (1995) (citation omitted).

**¶32** BNC argues that the trial court applied the wrong duty and standard of care. Further, citing "1 New Appleman Insurance Law Practice Guide § 2.14[1] (2016)," BNC posits that "Arizona recognizes a general duty of care that brokers owe to insureds to advise them about what insurance to buy[.]" However, BNC and Appleman's 2016 *practice guide* misunderstand or incorrectly interpret *Sw. Auto*'s holding. *Sw. Auto* did not hold that there is a duty to advise a client about what insurance to buy or whether to buy additional insurance. *See Sw. Auto*, 183 Ariz. at 447, 904 P.2d at 1271 (Details of conduct . . . have to do with whether the defendant breached the applicable standard of care, not whether a duty and attendant standard exist."); *see also Webb v. Gittlen*, 217 Ariz. 363, 367, ¶ 20, 174 P.3d 275, 279 (2008) (emphasis added) (citations omitted) (noting *Sw. Auto* holds "it was a question of breach, *not duty*, whether an agent's failure to advise a client about additional insurance gave rise to liability"); *Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 355, 107 P.2d 364, 367 (1985) (citation omitted) ("[D]isapprov[ing] of attempts to equate the concept of duty with specific details of conduct."). Given the confusion in distinguishing duty from the standard of care, and the standard of care from the breach analysis, we aim here to carefully separate the analysis as to each element.

#### 1. The Existence of a Duty

**¶33** In determining the existence of a duty, we look to the relationship between the parties. *Bellezzo v. State*, 174 Ariz. 548, 550, 851 P.2d 847, 849 (App. 1992). Whether a defendant owes a plaintiff a duty is a question of law. *Lasley v. Shrake's Country Club Pharmacy, Inc.*, 179 Ariz. 583, 585, 880 P.2d 1129, 1131 (App. 1994) (citation omitted).

**¶34** Here, there is no real quarrel as to duty; both parties concede that a duty exists. However, to be clear, once a duty exists, the next question is not what is the extent of the duty; the question most accurately is what

level of care does the parties' duty-inducing relationship trigger? The true conundrum stirring the parties in this case is the standard of care. Thus, we examine the applicable standard of care.

### 2.      The Applicable Standard of Care

**¶35**          Questions as to the applicable standard of care are for the trier of fact. *Sw. Auto*, 183 Ariz. at 445, 904 P.2d at 1269. Here, the trial court found that "[i]n connection with the 2008 insurance renewal, HUB had the duty to exercise the degree of care, skill, and diligence normally exercised by similarly situated insurance brokers having the information provided to HUB by BNC, advising about coverage, and taking into account BNC's directions, including the request to match expiring coverages." We will affirm the trial court's ruling so long as its "factual findings[,] explicitly or implicitly made," are not clearly erroneous, "even if substantial conflicting evidence exists." *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cty.*, 208 Ariz. 532, 537, ¶ 10, 96 P.3d 530, 535 (App. 2004) (citations omitted). "We review evidentiary rulings for an abuse of discretion and generally affirm a trial court's admission or exclusion of evidence absent a clear abuse or legal error and resulting prejudice." *Id.* at 544, ¶ 33, 96 P.3d at 541 (citation omitted).

**¶36**          As the trial court indicates, the default rule in Arizona is that a broker who agrees to obtain insurance for a client owes a duty to the client "to exercise reasonable care, skill and diligence" in so doing. *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 397, 682 P.2d 388, 402 (1984); *see also Webb*, 217 Ariz. at 367, ¶ 20, 174 P.3d at 279 (citations omitted) (acknowledging the *Darner* standard); *Sw. Auto*, 183 Ariz. at 448, 904 P.2d at 1272 (reaffirming the *Darner* standard). *Darner* also suggests that this standard of care is not universally applicable, and that an applicable standard should be determined on a case-by-case basis, and is an evidentiary determination that may require proof in the form of expert testimony at trial. 140 Ariz. at 397-98 & n.14, 682 P.2d at 402-03 & n.14. Thus, we must examine the record in this case to determine whether the relationship between BNC and HUB commanded the tailored standard the trial court imposed, or instead whether some different and heightened standard of care is applicable.[13]

---

[13]      We do not address, as the trial court did, whether a "special relationship" existed between BNC and HUB. As BNC repeatedly noted in its briefing on appeal, such an inquiry is "irrelevant" and has yet to be

**¶37** Obligations of reasonable care like the standard *Darner* pronounced for insurance agents have been deemed applicable in other contexts[14], and even in cases, unlike this one, involving fiduciary relationships, such as trustee-beneficiary. *See Forest Guardians v. Wells*, 201 Ariz. 255, 260, ¶ 13, 34 P.3d 364, 369 (2001) (internal quotation and citation omitted) ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property.").

**¶38** Here, pursuant to the PSA establishing their relationship, HUB was to be the exclusive broker of record for BNC for a period of five years. As noted above, under the PSA, HUB was not required to provide BNC with risk management services, to act as BNC's guarantor, or otherwise recommend services beyond those BNC actually sought. Moreover, during the 2008 renewal, from which the primary contentions in this suit arise, BNC directed HUB to obtain "servicing contractor coverage," and asked HUB for "any recommendations for other limit increases you feel appropriate," but, as noted BNC did not request any special endorsements or coverage *specific to* AMS or BNC's MLT program.

**¶39** To be sure, comparatively, the five-year relationship the PSA created between HUB and BNC is nothing near a fiduciary relationship, and the 2008 renewal did not add much more to the relationship. Furthermore, the record shows the trial court considered expert testimony, made extensive factual findings in this case, and took the facts of HUB's and BNC's relationship into account when determining an appropriate standard, and arrived at the standard noted *supra* ¶ 35. We find that by doing so, the trial court adequately complied both with *Darner*'s default rule and its case-by-case directive. *See supra* ¶ 36. Under these circumstances, we defer to the trial court's standard of care finding.

---

undertaken in Arizona. Neither of the applicable tort duty cases, *Darner* and *Sw. Auto*, specifically analyze whether such a relationship existed. We also note that in undertaking its duty inquiry, the trial court improperly relied on *Nelson v. Davidson*, 456 N.W.2d 343, 345-46 (Wis. 1990), which this court noted conflicts with *Darner*, because *Nelson* presented the question of duty as one of agency law, not tort law. *See Sw. Auto.*, 183 Ariz. at 448 n.2, 904 P.2d at 1272 n.2 (providing this explanation). *But see City of Phoenix supra* at ¶ 29.

[14] *See, e.g.*, *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 17, 945 P.2d 317, 328 (App. 1996) (auditor-client).

B.      Breach

**¶40**            "Whether the defendant's conduct breached the standard of care is usually a question for the trier of fact."  *Sw. Auto*, 183 Ariz. at 448, 904 P.2d at 1272 (citing *Bellezzo*, 174 Ariz. at 551, 851 P.2d at 850).  The evidence is sufficient to support the trial court's ruling that HUB did not breach the applicable standard of care.

1.      Under the applicable standard of care, HUB and/or its brokers were not required to assess and obtain coverage for unidentified risks.

**¶41**            In sum, BNC essentially argues that HUB failed to comply with its standard of care because: (1) HUB, and/or HUB's brokers, failed to take reasonable steps to assess (or identify) BNC's business risks; and (2) did not "honestly" advise BNC about the adequacy or appropriateness of HUB's recommended coverage to the extent it did, or did not, cover BNC's MLT business relationship with its outside servicing contractor, AMS.

**¶42**            We recognize that in deciding whether a broker has breached similar standards of care, the general rule is that "brokers have no [obligation] to advise insureds about the adequacy or appropriateness of the insurance coverage they purchase, or to inform them about optional coverage that might be available."  1-2 New Appleman on Insurance Law Library Edition § 2.05(5)(a) (hereinafter, Appleman Library Edition).  BNC cites no Arizona authority that has held that in complying with *Darner*'s standard of care, a broker, or other insurance professional, ordinarily must identify risks and recommend alternative or additional coverage than the client actually sought or requested.

**¶43**            We consider that *Sw. Auto*, from which BNC gleans a "duty" (or more accurately, a responsibility) for HUB to advise about what insurance to buy, does not impose an insurance professional with such obligations.  *Sw. Auto* merely reversed the trial court's decision to grant summary judgment, where an "expert testified that the standard of care in the community for professional insurance agents require[d] agents to advise clients about the relevant types of coverage that are available and the cost of the coverage," crafted to the "individual needs of the prospective insured."  183 Ariz. at 448, 904 P.2d at 1272.  The court specifically took issue with the fact that the trial court "summarily" rejected the expert's opinion, and concluded that the expert's testimony presented a question of fact that the trier of fact needed to decide — whether the standard of care for an insurance agent required the subject agent to "advise" of "the availability

of relevant types of coverage." *Id.* at n.3. To be clear, the Court of Appeals did not so much answer the question whether the insurance agent needed to *generally* advise of additional or alternative coverage, but instead, remanded to the trial court to reexamine the facts and undertake that inquiry. *Id.*; *see generally Sw. Auto.*

¶44 In support of its arguments, BNC claims the trial court erred in applying the standard of care because it failed to properly address, in its judgment, BNC's experts'—Eric Emmette and Robert Sulpizio—standard of care opinions at trial. As pertinent here, Emmette testified that HUB's broker failed to meet the applicable standard of care in providing broker services on BNC's account during the 2008 remarketing. He opined that the broker should have made efforts to understand BNC's business, specifically the MLT program, and its risks, and to read and understand the applications and information that BNC was providing during the remarketing. In this effort, he posited that the broker should have reviewed the policy's forms to look for gaps between what BNC's risks were and the coverages and policies being provided by the insurance carriers, to understand whether modification of the bond or excess bond was needed, or whether to explore other "available" options. For his part, Sulpizio testified that HUB breached the standard of care by failing to adopt policies, procedures and "quality controls" to ensure the broker had the background and training appropriate to the BNC assignment to deliver the level of service HUB promised in their financial institution advertising.

¶45 Because this case went to trial and a judgment was rendered, it is procedurally and factually different from *Sw. Auto.* Unlike the summary dismissal of the expert's testimony in *Sw. Auto*, nothing in the record before us suggests the trial court here did not consider BNC's experts' opinions. The fact that the court's ruling does not specifically mention Emmette and Sulpizio's expert testimony is irrelevant.

¶46 In relevant findings, the trial court found:

> [a]ny claim that BNC relied on HUB to perform risk identification and management duties is . . . belied by obligations imposed on BNC's management by BNC's primary regulator, the Office of the Comptroller of the Currency ("OCC"), which confirm that bank management is responsible for identifying and deciding whether to insure

risks, and that the broker's role is limited to assistance with selecting an insurer.[15]

It also found that,

> [i]n connection with the August 15, 2008 insurance renewal, BNC never provided HUB with a copy of the AMS-MLT agreement, or any of its subsequent amendments, of any of BNC's annual credit displays . . . or any of BNC's internal audits of the AMS relationship. BNC did not ask HUB to analyze the AMS MLT agreement for the purpose of recommending coverage . . . BNC did not disclose that AMS [had] been repeatedly sanctioned by [ADFI] for unlawful or other conduct.

The court additionally noted

> BNC's executives, including its CEO, testified that the underlying fraud was not foreseeable and that it was never identified as a risk before discovery of the loss by BNC, its auditors, or its regulators.

These findings were supported by the evidence in the record.

¶47        As it did in the trial court, BNC seeks to support a breach argument by highlighting three instances whereby it claims it provided HUB's broker "with information regarding the MLT program because the Bank wanted to ensure that *the* [unknown] *risk* was covered." (Emphasis added.) BNC notes: (1) "The Bank provided HUB with the Chubb bond renewal application that included an annual report discussing the MLT program;" (2) The Bank also provided HUB's broker "with a Travelers

---

15        BNC takes issue with the trial court's reference to the OCC, arguing "HUB never disclosed that handbook as a trial exhibit or offered it during trial as a trial exhibit." We find the trial court properly took judicial notice of OCC's regulations. *See, e.g.*, Ariz. R. Evid. 201(b)(1), (2) (a court may take judicial notice *on its own* or if it is requested); *Climate Control, Inc. v. Hill*, 86 Ariz. 180, 188, 342 P.2d 854, 859 (1959) *modified on reh'g on other grounds by* 87 Ariz. 201, 349 P.2d 771 (1960) (explaining that a court may take judicial notice of administrative regulations); *State v. Rojers*, 216 Ariz. 555, 560, ¶ 26, 169 P.3d 651, 656 (App. 2007) (citations omitted) (stating a court may take judicial notice of an agency's published manuals).

questionnaire in which the Bank described the MLT program;" and (3) The Bank arranged a September 4, 2008 conference call with HUB to discuss the MLT program and how to complete the Colonial and Travelers applications to ensure coverage for the risk associated with the MLT program. We will address each in turn.

**¶48** As to the first, the record established that BNC provided the Chubb policy, which was set to expire, to HUB with the understanding that HUB would match the coverages provided under BNC's expiring policies, not to independently complete extensive risk assessment. Further, HUB provided coverage, as requested.

**¶49** The second refers to a Credit Investment Questionnaire, and presumably the two application forms BNC filled out. However, as the trial court's ruling noted,

> [n]one of these documents references AMS or the MLT agreement; none mentions AMS's servicing duties; none is accompanied by a copy of the AMS MLT agreement; and none contains any tie between the AMS MLT agreement and any request for bond coverage, servicing contractor, or any other coverage.[16]

Much of this was affirmed by BNC's Eckroth during her trial testimony. Eckroth admitted that due to "oversight" BNC did not specifically identify AMS as a mortgage banker to which BNC extended credit in the Travelers'

---

16    BNC's drafted response to the relevant question in the questionnaire was that

> BNC does not extend warehouse lines; however, a similar product is offered where BNC purchases a participating interest in mortgage loans held for sale. BNC currently has one customer participating in this program which consists of a $25 million commitment, with a $2.5 million over-line facility. Each of the loans participated has a maturity of 120 days from origination.

But, BNC's Chief Credit Officer and president of its North Dakota operations, David Gordon Hoekstra, who testified to drafting this "alert" to "brokers of the MLT program," conceded that nothing in the description identified AMS or indicated that the description is tied to a specific request for servicing contractor coverage.

questionnaire. In fact, BNC failed to identify AMS even though the applications expressly asked BNC to mention, by name, the servicing contractor for which coverage was wanted. Even more than "oversight," Eckroth testified, in her deposition and at trial, that at the time she completed the Colonial application she did not know AMS was BNC's MLT contractor.

¶50　　　As to the September 4, 2008 conference call with HUB's broker—Plant, of the two BNC representatives participating—Eckroth and Franz, neither had direct responsibility nor a detailed understanding of the MLT program. Eckroth testified that while she remembered there was discussion of the MLT program during the call, she did not remember the specifics. She confirmed that she was not "involved in the oversight and management of the MLT program"—and in fact, had no role in the operation of the MLT program. She stated that she did "not consider [herself] knowledgeable about how the MLT program operates, and had never read the AMS MLT agreement."

¶51　　　The trial court noted that Franz repeatedly testified that it was not his "responsibility" to know the details of the MLT program. It stated that Franz confirmed he had never read the AMS MLT agreement, was not involved in the day-to-day management and oversight of the program, and was not familiar with the mechanics of the program. However, the court noted that when asked whether he discussed servicing contractor coverage in the context of the MLT program during the phone conversation, Franz responded:

> Yes, we did . . . We talked about the fact that AMS originated loans and sold them on the secondary market; that *they serviced them in the interim period, and that we wanted coverage for those servicing activities*.

As to this response, Franz was impeached on cross-examination with his 2012 testimony from the coverage litigation between BNC and the insurance carriers. The court found that in the coverage litigation, Franz had testified that he "d[idn't] recall" whether he "ever discuss[ed] BNC's relationship with AMS with Brett Plant" or whether he was "ever present at any meetings, phone conferences, [or] video conferences in which anyone at BNC discussed BNC's relationship with AMS with Brett Plant." Having highlighted Franz's testimony in its ruling, the court likely concluded that Franz was not credible.

18

¶52        Most importantly, none of Eckroth's and Franz's testimonies indicated that they requested or directed HUB to independently identify risks that may stem from BNC's relationship with AMS.  The trial court concluded that "even assuming the accuracy of Mr. Franz's testimony in this litigation regarding the September 4, 2008 phone call, it establishes only that BNC sought *fidelity coverage* for AMS's servicing activities, which HUB helped BNC obtain."  (Emphasis added.)

¶53        The applicable standard of care did not require HUB and/or its broker to undertake independent risk evaluation.  *See, e.g.*, Couch on Insurance § 46:38 (3d ed. 2014) ("Insurance agents do not have an independent [obligation] to identify their clients' needs and to advise them regarding whether they may be underinsured because it is the client's responsibility or [obligation], not the insurance agent's, to determine the amount of coverage needed and advise the agent of those needs.").  Based on BNC's specific coverage requests, it would be far-reaching to say that it behooved HUB to identify BNC's risks generally, and more specifically the unbeknownst particular fraud risks AMS posed.

¶54        We nonetheless consider the possibility whether HUB may have been required to affirmatively recommend additional or alternative coverage that may have protected BNC from the particular fraud AMS perpetrated due to BNC's request that HUB provide BNC with "any recommendations for other limit increases you feel appropriate," or "recommendations for enhancements to [BNC's] insurance program." However, based on the record and general legal consensus, we cannot surmise so much.

¶55        Firstly, the general rule is that vague requests for coverage do not change the broker's obligations.  *See* Appleman Library Edition § 2.05(5)(b); *see e.g., Trotter v. State Farm Mut. Auto. Ins. Co.*, 377 S.E.2d 343, 347 (S.C. Ct. App. 1988) (internal quotations and citation omitted) (expressing the rule: "A request for 'full coverage,' 'the best policy,' or similar expressions does not [oblige an insurance agent] to determine the insured's full insurance needs, to advise the insured about coverage, or to use his discretion and expertise to determine what coverage the insured should purchase").

¶56        Secondly, in its brief on appeal, HUB informs that it offers risk management services at additional costs, beyond what BNC paid for HUB's services; this strongly suggests HUB never agreed to provide BNC with risk

assessment services.[17] BNC does not refute that it did not pay additional costs for risk assessment services. Thirdly, it is difficult to understand how BNC could have expected HUB to adequately identify the possible risks AMS posed. Given the unique circumstances regarding AMS, particularly its unlawful activities extending back to 2006 before HUB was BNC's broker, not providing HUB with information more specific to AMS is fatal for BNC. It is also hard to see how HUB could have been expected to identify the specific fraudulent lapping scheme at issue here, or propose additional or alternative coverage to more "adequately" protect BNC in its relationship with AMS, when BNC itself did not foresee this fraud and did not provide HUB with a copy of the AMS MLT agreement. *See* Appleman Library Edition § 2.05(5)(d) (stating that a broker is not in breach for failing

---

[17] Evaluating the breach of the standard of care, as Sulpizio suggested, in terms of the extent to which HUB's broker's level of service—having not retrospectively met BNC's standards—comported with the level of service HUB advertised in its financial institution advertisements would distort the facts and ignores insightful legal principles. First, it is a well-known starting legal principle that advertisements are generally regarded as invitations to the public, not specific offers of service. Second, relevant factors weigh against assigning a requirement to advise to HUB based on advertisements indicating that HUB provides risk analysis. *See* Couch, § 46:38 ("Some of the factors relevant to a determination of whether a long-term relationship or special circumstance exists between an insurance broker and the insured sufficient to impose a duty on the broker to obtain additional information necessary for coverage include: (1) the broker's exercise of broad discretion in servicing the insured's needs, (2) the broker's counseling of the insured concerning specialized insurance coverage, (3) the broker's declaration that he is a highly skilled insurance expert, coupled with the insured's reliance upon the expertise, and (4) the broker's receipt of compensation above the customary premium paid for expert advice provided.").

Here, in addition to BNC's failure to separately pay for risk advising, the marketing materials stated they were "presented without any representation or warranty," and directed potential clients to "consult your own professional advisor about your insurance needs." Thus, BNC would be unjustified in relying on the relevant ads. Neither does the record suggest HUB exercised broad discretion in servicing BNC's needs. The record is replete with letters and emails confirming BNC's practice of asking specific questions about issues it wanted its broker to consider.

to advise, and thus cannot "face liability[,] unless [the] insured provides them with the information necessary to render the advice sought").

¶57     Moreover, we agree with the trial court that it would be incongruous to impose upon an insurance broker "a duty to identify risks resulting from a client's business operations *that the client itself was unable to foresee* despite the sensitive and highly regulated nature of the client's business." (Emphasis added.) Given the highly-regulated nature of the banking industry, it is reasonable that risk identification should be deemed a bank's obligation; of course, unless a broker agrees to take on such obligations on behalf of the bank. It seems most reasonable that a bank, its directors and managers, particularly those with risk management responsibilities should first clearly assess and identify the risks the bank face, and then, "decide the most appropriate method for treating a particular risk"—including whether they ought to request coverage for the identified risk(s). *See, e.g.*, *Sadler v. Loomis Co.*, 776 A.2d 25, 40 (Md. App. 2001) (citation omitted) (stating, "the insured is generally considered best able to balance the factors relating to potential economic loss against the expense of purchasing additional insurance, the likelihood that a particular risk will materialize, and the insured's own comfort level with the risks versus the cost of greater protection"). If they decide to obtain particular coverage, and in fact make such a request to a broker, and the broker agrees to seek such coverage for the bank, then the broker must act in accordance with the standard of care in seeking out the appropriate coverage to meet the identified risk(s).

¶58     We hold that where a bank fails to identify or foresee its own risks, but makes a general request for additional coverage recommendations, a broker need not assess for risks absent a specific request to identify, and an agreement to do so, accompanied by adequate information to undertake such assessment.[18]

    2.    HUB's conduct satisfied the applicable standard of care because HUB obtained coverage for BNC that was consistent with or better than BNC actually requested.

¶59     In meeting the default standard of care under *Darner*, HUB's brokers were required to perform in accordance with the "degree of care ordinarily to be expected from others in [their] profession." 140 Ariz. at

---

[18]    To reiterate, statements regarding conduct, like this one, pertains to the applicable standard of care and has no bearing on the duty element.

398, 682 P.2d at 404. At trial, HUB's expert, John Alberts, explained that the insurance broker's duty is ordinarily satisfied by

> act[ing] on the instructions of the client, [going] to the market place to obtain terms or to market an account, and [responding] back to the client in a timely manner with either proposals or the information that the insurance product or coverages that were part of the instruction from the client are either not available or available at an extraordinary expense.

This testimony is supported by Appleman's Library Edition. *See* Appleman Library Edition § 2.05(3)(a) (stating that an insurance broker's obligation of care to an insured is ordinarily satisfied by "procur[ing] the coverage specifically requested" and/or informing the insured that the requested coverage is unavailable).

¶60 The Restatement (Second) of Torts also states that

> [w]hen an act is negligent only if done without reasonable care, the care which the actor is required to exercise to avoid being negligent in the doing of the act is that which a reasonable man in his position, with his information and competence, would recognize as necessary to prevent the act from creating an unreasonable risk of harm to another.

Restatement (Second) of Torts § 298 (1968). BNC cites no authority indicating that *Darner*'s requirement that a broker display the level of skill and diligence normally possessed by members of his profession, required a broker to obtain and display, without specific requests and agreement, specialized knowledge related to advising about risks or to diligently assess and surveil for unidentified risks. The record supports the trial court's implicit adoption of HUB's expert's testimony; we defer to the trial court as such reliance is not clearly erroneous.

¶61 The record shows that HUB's broker, Thomas, discussed with BNC options it might consider and asked if BNC wanted to pursue certain options with renewal. HUB's broker, Plant, sent the insurance coverage proposals it received from the insurers to BNC, thereby giving BNC the opportunity to examine whether the proposed coverage would provide it with adequate protection. Plant made changes to the requested coverage proposal and he even flew to Minneapolis to present the proposal at a BNC board meeting. No questions were raised at the meeting about servicing contractor coverage. Ultimately, because of its brokers' work, HUB obtained for BNC coverage that was consistent with or better than BNC

requested, based on the direction and information BNC actually provided.[19, 20] The possibility that BNC may have been better served by a more assertive and proactive broker does not put HUB in breach of the applicable standard of care.[21]

---

[19] This is established by an exchange between HUB's counsel and BNC's Eckroth in the trial transcript:

Q. All right. Let's take a look at what you actually requested in writing, what's documented, a request to remarket, and HUB did that remarketing; correct?
A. Yes.
Q. And you asked that HUB look at the option of a three-year prepaid policy, and HUB did that; correct?
A. Yes.
Q. And you asked that they quote—that the quote include various deductible options, and HUB did that as well; correct?
A. Yes.
Q. And finally you asked that the quote include renewal at current limits, plus an increased limit for BPL—that stands for banker's professional liability; correct?
A. Yes.
Q. And that was also accomplished by HUB; correct?
A. Yes.
Q. And for recommendations for other limits increases you feel appropriate, and HUB did that as well; correct?
A. I believe, yes.

[20] We draw specific attention to the fact that BNC's own expert, Mike Hogan, acknowledged that the servicing contractor coverage HUB obtained for BNC was broader than the coverage afforded by BNC's expiring Chubb policy.

[21] BNC notes behavioral issues with Plant that HUB became aware of in 2010 but did not subsequently inform BNC of. These issues are attenuated from the work Plant did back in 2008 to have relevance in this appeal. We are similarly unconvinced that HUB should be liable because it did not assist BNC in pursuing its July 2010 insurance claim against BNC's insurers, (as suggested in HUB's advertisements). *See* Couch § 46:38 (suggesting that absent a specific agreement an insured's agent [(or here broker)], would not have a continuing obligation—assuming they had such

¶62        The fact that in the financial institution bond HUB obtained for BNC from Colonial, Colonial agreed to "indemnify" BNC for "[l]oss resulting directly from dishonest or fraudulent acts committed by any servicing contractor acting alone or in collusion with others" is crucial to the outcome in this matter. The trial court noted that "BNC affirmed at trial its position that [Colonial] and Travelers were wrong to deny coverage for the AMS [relationship] and did so in bad faith and with an 'evil' mind." The court explained that

> BNC's position is supported by detailed, extensive reports and analysis by multiple experts engaged by BNC, including a professor of insurance/former deputy insurance commissioner, an insurance law professor and author of casebooks on insurance law, a mortgage banking industry expert with 37 years of experience, and a forensic accountant—each of whom concluded that there was coverage under the [Colonial] bond for the AMS loss.

¶63        Accordingly, any argument the insurers may have made to convince BNC it did not have coverage for AMS's fraud—hence the settlement and subsequent suit against HUB—does not foreclose the trial court's finding that coverage existed, even for AMS, pursuant to the servicing contractor coverage provided by the Colonial bond. *See supra* n.7 (documenting the language of the bond and AMS's servicing responsibilities). While the trial court included these findings in its causation analysis, we conclude they are more appropriately presented in the discussion of breach.[22] It would be illogical to conclude that a broker should be deemed in breach for not obtaining coverage, even where the insured concedes that such coverage was obtained. We do not agree with BNC's apparent position that HUB should nonetheless be held liable

_____

an obligation in the first place— to advise "guide, or direct the insured's coverage after the agent has complied with his or her obligation to obtain coverage on behalf of the insured"). Notably, BNC did not join HUB as a party to the coverage litigation.

[22]        The trial court did note that to the extent its conclusions of law contained findings of facts, those findings were "incorporated into" the findings of fact.

24

because the insurance carriers could, and did in fact, contest the existence of coverage.

**¶64** On the record before us, we find the evidence sufficiently supported the trial court's finding that HUB did not breach the applicable standard of care. Accordingly, because BNC did not carry its burden to show breach, we need not discuss the issue of liability further.[23] Likewise, we affirm the trial court's final judgment as to damages—i.e., HUB did not cause, and thus is not responsible for, BNC's damages.[24]

---

[23] Among the issues we need not discuss is whether HUB breached the applicable standard of care by assigning BNC to the broker, Plant.

[24] BNC alleged that it suffered more than $26 million in losses for the fraudulent lapping scheme AMS perpetrated. BNC argued that because of coverage denials it did not receive "15 million in MLT insurance proceeds"— and was forced to sell its banking operations in Phoenix and Minneapolis and other assets. It sought to recover more than $27 million dollars from HUB. On partial summary judgment as to damages, the trial court limited BNC's potential damages award, finding: (1) Because BNC already received $7.5 million of the $14.9 million—the actual amount of coverage under the bond—combined policy limits it thus was not entitled to what would be double-recovery under Arizona law; (2) BNC is not entitled to recover commissions paid to HUB; (3) BNC was not entitled to pre-judgment interests of its unliquidated damages; and (4) BNC cannot recover attorneys' fees in connection with its lawsuit under Arizona law.

## CONCLUSION

¶65 For the foregoing reasons, we affirm the trial court's rulings as to these matters.



AMY M. WOOD • Clerk of the Court
FILED: AA